[L. A. No. 17921.   In Bank.—Sept. 30, 1941.]

MRS. BEULA F. CHILDRESS et al., Respondents, v. JOHN T. PETERSON, Individually and as Chief of Police, etc., et al., Appellants.

Dayton L. Ault, City Attorney, and Morey S. Levenson and J. H. McKinney, Deputies City Attorney, for Appellants.

Thomas Whelan, Vincent Whelan and Whelan & Whelan for Respondents.

PULLEN, J., *pro tem.*—In this proceeding in mandamus the trial court entered a judgment which reinstates plaintiffs in the positions of policewomen of the city of San Diego, and directs payment of their salaries at the rate of $157 per month from date of commencement of the action. Defendants, the city, its officers and agents, have appealed.

Prior to 1939, plaintiffs reached the status of classified employees of the city under its civil service rules and regulations (Charter of San Diego, art. VIII, Stats. 1931, p. 2906). On June 22, 1939, the acting chief of police addressed a letter to each of them reading: ''This is to inform you that the 1939–1940 budget only makes provision for two policewomen in this department and due to the fact that others hold seniority over you in service it becomes my duty to terminate your services as of July 15. Your services have been satisfactory and you may apply to the Civil Service Commission for reinstatement to the eligible list in case provisions are made later for additional policewomen.''

The question is whether the above notice operated to effect plaintiffs' discharge. Appellants contend that when the civic welfare will be promoted by a reduction of personnel, the city officials are empowered in the exercise of their administrative discretion to eliminate positions and dispense with the services of any number of employees of a given class. In 1939 they were endeavoring to lower the tax rate by enforcing a program of economy in the expenditure of city funds. They had scaled budget estimates with a view to accomplishing this end and planned, among other restrictions, to limit the force of policewomen. On July 5, 1939, they passed an annual appropriation ordinance (No. 1617 N. S.), which provided a reduced appropriation for the salary account of the police department. They claim that by virtue of this reduction, their program of economy, their intention to dispense with the services of some of the policewomen, and the giving of the above notice, plaintiffs' dismissal from the service was validly accomplished.

Plaintiffs assert that the notice was ineffective because it failed to set forth the true motive underlying the attempted dismissal, which was not that of economy; that the positions

were never in fact eliminated; that sufficient money was appropriated and was available at all times for payment of salaries; and that the prescribed procedure for effecting the lay-off or discharge of civil service employees was not observed. These contentions were upheld by the trial court. The evidence establishes the correctness of its findings and conclusions.

While the executive officers of a city, acting under enabling legislation, have plenary power to exercise full administrative judgment and control over city employees and to promote a program of economy in good faith, they are required in the enforcement of their judgment to act in conformity with charter provisions and procedural requirements. (*Lotts* v. *Board of Park Commrs.*, 13 Cal. App. (2d) 625 [57 Pac. (2d) 215]; *O'Neill* v. *Williams*, 53 Cal. App. 1 [199 Pac. 870]; *Jenkins* v. *Board of Civil Service Commrs.*, 137 Cal. App. 410 [30 Pac. (2d) 606]; Note 111 A. L. R. 432, 438.)

In the present case this was not done. The positions held by plaintiffs were not abolished by the city council, although this would have been one means of reducing the force of policewomen. The fiscal year of the city of San Diego runs from July 1st to June 30th of the succeeding year. In May or June the city council passes a classification ordinance creating and establishing positions in the city service and repealing the ordinance enacted the previous year. The classification ordinance passed in 1939 (Ord. 1611 N. S., enacted June 13, 1939), repeated the provision made by several prior classification ordinances (Ord. 1160 N. S., passed May 25, 1937; Ord. 1387 N. S., passed May 24, 1938), for the creation and establishment of positions for eight policewomen. This ordinance, like the ones preceding it, created many positions which were never filled, the excess being designed to safeguard against emergencies which might arise during the fiscal year requiring additional help in different departments. In the police department no more than six policewomen were ever employed, and just prior to June 1, 1939, there were only five in the service. Thus at all times a sufficient number of positions to cover plaintiffs' employment were established by ordinance and remained unabolished.

The positions held by plaintiffs were not vacated nor was plaintiffs' employment terminated by virtue of the absence of sufficient funds for payment of their salaries. Conceding that the council could have brought about a dismissal by either general or special appropriation eliminations, coupled with an intent on the part of a majority of the councilmen to dispense with plaintiffs' services, the evidence shows that such purpose was not accomplished because the appropriation for police salaries had not been made at the time the notices of dismissal were sent, and as later made it was not inadequate. Neither was it exhausted at the time of trial of this cause.

Under the procedure set up by charter provisions it is the duty of the city manager to keep the council advised of the city's financial needs and, on or before the first meeting of the council in May, to prepare and submit to it a report of all departments and an annual budget estimate for the succeeding fiscal year. (Stats. 1931, p. 2860, § 28, p. 2886, § 69.) The council then prepares an annual appropriation ordinance, using the estimate as a basis, and while it may reduce or eliminate any item, it cannot increase any amount or add any new item. (Stats. 1931, p. 2888, § 71.) It is required to establish by ordinance a schedule of uniform compensation for officers and employees in the classified service. (Stats. 1931, p. 2912, § 130.)

The evidence here shows that a budget estimate was duly filed by the city manager on May 2, 1939. There had, however, just been a city election which resulted in a change of administration, so that early in May several new councilmen, and on June 1st a new city manager, took office. The councilmen instructed the new manager to prepare a budget estimate which would reduce the city expenditures by approximately half a million dollars. The new manager thereupon prepared a revised or new estimate (Document 314,188, Budget Estimates for 1939–1940, dated June 15, 1939), and transmitted it to the council with a letter stating: "Budget figures for departments not under the manager's control are submitted exactly as requested by those departments. The budget is the basis of the Appropriation Ordinance. . . . " This estimate, like the earlier one, contained a recommendation of the manager for an appropriation to cover the salaries of five policewomen, in the amount of $10,056. The full

appropriation recommended was $352,088.50, which with anticipated revenue of $165,000 from other sources, and anticipated deductions of $3500, would make available for salaries and wages in the police department, a total sum of $520,588.50.

After hearing and consideration of the estimates, and on July 5, 1939, the council passed the annual appropriation ordinance (Ord. No. 1617, N. S.). This ordinance appropriated $345,560.50 for police salaries and wages (a reduction of $6528 from the estimated figure of $352,088.50), in addition to the $165,000 anticipated revenue to be used for the same purpose, making a total fund of $510,560.50 available for the payment of salaries and wages to officers and employees of the police department. The items comprising the salary and wage account were not listed separately in the ordinance as they had been in the budget estimate. Only the lump sum in a reduced amount as finally appropriated was given. So far as shown by the ordinance, therefore, the reduction was general and applied proportionately to all police salaries and wages and not solely to the item for policewomen.

Appellants offered testimony by the acting chief of police to prove that he knew when he addressed the notice of dismissal to plaintiffs on June 22nd that the amount which would be appropriated, and was later actually appropriated by the ordinance of July 5th, would be insufficient to pay all salaries for the coming year. Appellants also offered testimony of a councilman to explain and reconcile the reductions made in the salary and wage and other budget items pertaining to the police department, in order to prove an intent on the part of the councilmen to effect a program of economy and among other things to dispense with the services of the policewomen by failing to appropriate money for their salaries. The trial court excluded this line of testimony on the ground that oral statements regarding official action were inadmissible to vary the written records and explain that an appropriation reduction shown on the ordinance as general was in fact intended to be special and to cover only one item of the account, thereby effecting the discharge of a certain group of employees.

The exclusion of this testimony was proper. The official record of the action of the council could not be altered by oral

statements of individual councilmen. Under the procedure provided by the charter for the creation and abolishment of positions, the preparation and submission of budget estimates, and the preparation and passage of the annual appropriation ordinance, that ordinance and the other official documents constituted the record of official action. (See Stats. 1931, p. 2855, § 13.) While the evidence as a whole indicated that it was probably the intent of a majority of the councilmen to put into operation a uniform program of reduced expenditures, and that one of the savings contemplated was the reduction of the force of policewomen and the performance of their work by other employees of the department, and there is no intimation that the officials did not act in good faith or that they were controlled by other than what they thought would best advance the public welfare, nevertheless their official intent to reduce the force of policewomen, unaccompanied by proper official action of record, was not sufficient to accomplish their purpose.

So far as lack of funds is concerned, the evidence shows that the reduced appropriation, coupled with other sums which could lawfully be used for the same purpose, was in fact adequate to permit the payment of plaintiffs' salaries. The deputy city auditor, testifying at the trial on February 8, 1940, stated that between July 1, 1939, and January 31, 1940, both inclusive, only $292,285.86 had been expended for police salaries and wages, leaving a balance in the fund of $218,274.64. Therefore, if the monthly expenditures for salaries during the last five months of the fiscal year remained at the same average level as during the first seven months, as they probably would if no additional appointments were made, the end of the fiscal year would find an unexpended balance in the salary and wage fund of over $9000. The auditor also testified that on January 31, 1940, there remained an unappropriated balance of $25,932.89 in the general fund of the city. This statement apparently referred to the balance of a $150,000 appropriation, designated in the ordinance as ''unappropriated balance,'' and authorized by the charter (Stats. 1931, p. 2887, § 69 h), to provide a fund ''available for appropriation later in the fiscal year to meet contingencies which might arise''; for example, a shortage in another fund, such as the police salary fund. It is therefore apparent that there was never at any time during the

fiscal year, up to the date of trial of this cause, any actual or threatened shortage in the funds appropriated and available to pay plaintiffs' salaries.

█ Appellants objected to admission of the auditor's testimony on the ground that it was not necessary for the council to wait for an entire appropriation to be exhausted before effecting economies, and therefore the condition of the fund at time of trial was immaterial. But this argument is answered by the fact that the council did not take proper steps to effect the economies it contemplated and was therefore forced to justify plaintiffs' dismissal by attempting to prove either the absence of a sufficient appropriation or an actual shortage of funds. Neither factor was established.

█ Lastly it is contended that even if the action of the council was ineffectual, the plaintiffs were validly discharged by their appointing officer, the chief of police. The pertinent charter provision is § 57 (Stats. 1931, p. 2877), which states: "The Police Department shall consist of a Chief of Police and such other officers, members and employees as the Council may from time to time by ordinance prescribe. . . . The Chief of Police may appoint, subject to the approval of the Manager, an Assistant Chief of Police, a Chief of Detectives, and all members, officers and employees of the Police Department, subject to the Civil Service requirements of this Charter." The charter also provides a procedure, under the protective regulations of the civil service commission, for the suspension or dismissal of employees by the appointing power for cause after notice (§ 57, supra; also Stats. 1931, p. 2911, art. viii, § 129). Appellants argue that the power of appointment conferred upon the chief of police by the charter provision to fill offices created by ordinance, implies a corresponding power in him to vacate such offices by discharge of the appointees where such action is taken in good faith in order to effect economies or otherwise promote the welfare of the department.

The provisions, as we read them, confer no such implied power. Their purport is to place the control of positions and offices, and the power to create or abolish them, in the council. While the appointing officer is not required to fill all offices which are created, once he has filled a position, he has no implied power to discharge the employee at will or to suspend with a view to later appointing another whom he

may deem to be better qualified, to fill the vacancy. He may only remove or suspend employees or reduce the personnel in any branch of the department by taking action in conformity with the restrictions and procedural requirements of the civil service regulations. In this connection § 5 of article xii of the civil service rules prescribes the procedure for a reduction of personnel by the appointing officer in the exercise of his discretion in a proper case. It provides: ''Whenever it becomes necessary to reduce the number of employees in a given class, the appointing authority shall, prior to such impending reduction, notify the Personnel Director of the number of positions in the class to be vacated, indicating the reasons therefor. The Personnel Director shall thereupon furnish the appointing authority the names of the employees in the order such lay off shall be effective.'' The order of lay off is prescribed by § 6.

█ The opening phrase of § 5, ''whenever it becomes necessary to reduce the number of employees,'' is sufficiently broad to authorize a reduction of the force made necessary by the stress of economy, or for lack of funds, or lack of work, or any other factor embraced in an effort in good faith to promote the efficiency and proper functioning of the department. Moreover it does not contemplate that in order to institute a program of economy an appointing officer necessarily has to use up his entire appropriation as a preliminary to proving good faith in making the reduction. █ The essential elements are substantial compliance with the procedural requirements outlined in the regulations, a true statement of the reasons underlying the reduction, and due notice to the end that priority and seniority may be determined and govern the discharges.

In the present case the acting chief of police testified that he sent the notices of dismissal to plaintiffs on the order of the city manager, one purpose being to promote economy. The notices themselves set forth a different reason, that is, no provision in the budget, whereas the budget did make provision. Furthermore the appointing officer, having submitted a budget estimate allowing for plaintiffs' salaries, could not have anticipated that the council would reduce the recommended amount in enacting the appropriation ordinance. Yet the notices of discharge preceded the enactment of the ordinance. It was also shown by evidence bear-

ing on the issue of good faith that there was a controversy over the desirability of taking plaintiffs off the detail of supervision of the dine and dance establishments of the city, and therefore the cause of dismissal set forth in the notices may have been a mere subterfuge, cloaking an attempt to remove plaintiffs for entirely different reasons. At any rate the notices were clearly defective and could not serve as a basis for proceedings leading to plaintiffs' suspension or discharge.

The judgment is affirmed.

Gibson, C. J., Curtis, J., Carter, J., and Traynor, J., concurred.