[No. B003559. Second Dist., Div. Two. Oct. 12, 1984.]

KAREN CREIGHTON et al., Plaintiffs and Respondents, v.
CITY OF SANTA MONICA, et al., Defendants and Appellants;
SANTA MONICA RENT CONTROL BOARD, Real Party in Interest and
Appellant.

## COUNSEL

Robert M. Myers, City Attorney, Stephen S. Stark, Assistant City Attorney, Karl M. Manheim and Martin T. Tachiki, Deputy City Attorneys, for Defendants and Appellants.

Michael Heumann, Stephen P. Wiman, Marsha Jones Moutrie, Joel Martin Levy and Barbara O'Hearn for Real Party in Interest and Appellant.

Stacey & Jones, Sherman Stacey, David M. Shell and Craig Mordoh for Plaintiffs and Respondents.

## Opinion

COMPTON, Acting P. J.—In April 1979, the Santa Monica City electorate amended its city charter by initiative measure establishing a comprehensive system of controls on residential rents. To administer this system the amendment provided for the creation of a permanent rent control board (Board), consisting of five popularly elected commissioners, with the authority to regulate maximum rents and to issue permits for the removal of rental units from the rental housing market. The new charter provision specifically empowered the Board to "hire and pay necessary staff" (Santa Monica City Charter, art. XVIII, § 1803(f)(6)) and to "finance its reasonable and necessary expenses by charging landlords annual registration fees." (Santa Monica City Charter (Charter), art. XVIII, § 1803(n).) By a series of subsequently enacted ordinances, the Santa Monica City Council affirmed the authority of the Board to determine its financial and personnel policies. As a result, since 1979, the Board has adopted its own budget and retained the services of eight staff attorneys to represent it in well over three hundred cases.

Some four years later, in November 1983, plaintiffs instituted a taxpayers action[1] against defendants City of Santa Monica (City), various municipal officers, and the Board, as real party in interest, challenging the Board's legal authority to formulate its own budget and hire an independent legal staff. Plaintiffs' generally contended that there had been an illegal expenditure of public funds and an unlawful delegation by the City attorney of his official duties. The superior court, ruling in favor of plaintiffs, enjoined the Board from continuing to adopt its own budget and directed the City attorney to begin representing the Board in all legal matters. Defendants and real party in interest appeal, arguing that the trial court exceeded its jurisdiction by deciding a purely legislative matter and erroneously ignored the intent of the electorate in interpreting the City Charter. We agree and therefore reverse the judgment.[2]

---

[1]Plaintiffs Karen Creighton, David Dobrin, and Dale Berguson are Santa Monica taxpayers and renters who pay to their landlords $6 each month as reimbursement for a registration fee that the landlords must pay to the Board.

[2]Following entry of judgment and issuance of a peremptory writ of mandate, the trial court issued a stay order to June 30, 1984, upon the condition that defendants and real party in interest begin implementation of the judgment. The Supreme Court, however, subsequently granted a writ of supersedeas that stayed the effect of the trial court's ruling pending the outcome of this appeal.

The City is a municipal corporation organized under the laws and Constitution of the State of California and freeholders' charter adopted November 5, 1946, under sections 3 and 5 of article XI of the state Constitution. The Charter itself establishes a "Council-Manager" form of government, under which the City Council is vested with all powers of the city except as limited by the Charter and the state Constitution. The Council may confer additional powers on other charter agencies, but may not take away powers specifically conferred by the Charter. The City Manager is designated the chief executive officer and head of the administrative branch of the city government, responsible to the Council for the proper administration of all affairs of the City.

The Charter further establishes a general budgetary process under which the City Manager is to prepare and transmit to the Council a proposed budget based on estimates of revenue and expenditures received from each of the various City departments. The Council is then to consider the proposed budget, make appropriate revisions and, following public hearing, adopt a budget.

The adoption of the budget is, of course, the primary tool by which the City Council translates policy into action. The Council projects revenues and determines levels of fees and taxes. It appropriates funds for mandatory costs, basic City services, and discretionary programs. It authorizes expenditures for personnel, ordinary expenses, and capital improvements desired in the forthcoming fiscal year. Each agency and department is therefore required to submit a detailed work program delineating its goals, specific objectives, and other miscellaneous budget items necessary to carry out its mission.

Following adoption of the budget, the City controller audits requests for expenditures by the city departments to insure that funds have been appropriated. The City treasurer may then issue warrants on City accounts.

The City attorney, who serves at the pleasure of the Council and is subject to its control, generally conducts the legal business of the City. The holder of this office is responsible for giving legal advice and making tactical decisions in all litigation matters. The Council, however, retains the authority for making final decisions as to the prosecution, settlement, or appeal of all civil cases involving the City.

Article X of the Charter provides for the establishment of certain specific boards and commissions, whose members are appointed by the Council. Other appointed City departments have been established by ordinance. Pursuant to article XIII of the Charter, the Council may confer additional duties

upon a commission or board established under the Charter, but may not detract from the Charter-prescribed functions of officers and agencies. None of these appointed agencies possess the authority to impose fees, adopt budgets, hire staff, or sue and be sued. The City attorney furnishes legal advice and representation to these agencies.

At the heart of the controversy in the instant case is the Santa Monica Rent Control Law as set forth in article XVIII, sections 1800-1812 of the City Charter. This amendment to the Charter was proposed by initiative, was adopted by the City electorate on April 10, 1979, and took effect immediately upon passage.[3]

The measure specifically provides for the establishment of an elected Rent Control Board and assigns to it duties including the registration of all controlled rental units, the establishment and adjustment of fair and equitable rent levels for those units, and the issuance of permits for the removal of controlled units. (§ 1803.) The Board is expressly given the power to issue necessary rules and regulations, and to hire and pay necessary staff. (§§ 1803(f)(6), 1803(g).) The Board is empowered and required to charge landlords annual registration fees in amounts it deems reasonable in order to finance its reasonable and necessary expenses. (§ 1803(n).)

Shortly after the passage of the amendment, the City Council adopted Ordinance No. 1127 to codify, clarify and implement article XVIII and "to integrate it into the whole of the City, its government, law and plans." This ordinance provided, inter alia, that the City Manager and City staff were to administer and supervise the Board's financial, personnel and purchasing affairs. Ordinance No. 1127 did, however, recognize the Board's final appointing authority over its employees. Although the Board was required to submit a budget in the same manner as other City departments, its budget was to be approved as transmitted except the Council reserved the power to disapprove items requiring the expenditure of general funds or involving "a manifestly unreasonable use of public resources or manifestly unreasonable risk of loss to the City." Suits against the Board were to be considered suits against the city and defended by the City attorney.

In April 1980 and December 1982, Ordinance No. 1127 was extensively amended by the City Council. The newly adopted ordinances, codified as sections 4601-4615 of the Santa Monica Municipal Code, placed the power to administer and supervise financial, personnel, and purchasing affairs with the Board and its staff. Specifically, Ordinance Nos. 1153 and 1265 recog-

---

[3]The full text of Article XVIII is set out in the appendix hereto.

nized the Board's authority to hire its own legal staff and, following a public hearing, to adopt its own budget.[4]

In challenging the Board's legal authority to act autonomously, plaintiffs generally rely upon those provisions of the Charter that prohibit both the City Council and City attorney from delegating any of their prescribed duties.[5] Both defendants and real party in interest argue, however, that the rent control laws may be harmonized with the general Charter provisions so as to give effect to the will of the electorate and thus allow the Board to maintain its independence from other municipal agencies.

■ A city's charter is, of course, the equivalent of a local constitution. It is the supreme organic law of the city, subject only to conflicting provisions in the federal and state constitutions and to preemptive state law. (*San Francisco Fire Fighters* v. *City and County of San Francisco* (1977) 68 Cal.App.3d 896, 898 [137 Cal.Rptr. 607]; *Brown* v. *City of Berkeley* (1970) 57 Cal.App.3d 223, 231 [129 Cal.Rptr. 1].) "[Charter] cities may make and enforce all ordinances and regulations subject only to restrictions and limitations imposed in their several charters. . . . Within its scope, such a charter is to a city what the state Constitution is to the state." (*Campen* v. *Greiner* (1971) 15 Cal.App.3d 836, 840 [93 Cal.Rptr. 525].)

■ Under settled rules of statutory interpretation, the various sections of a charter must be construed together, giving effect and meaning so far as possible to all parts thereof, with the primary purpose of harmonizing them and effectuating the legislative intent as therein expressed. (*Hanley* v. *Murphy* (1953) 40 Cal.2d 572, 576 [255 P.2d 1].) Where it is impossible to reconcile conflicting provisions, special provisions control more general provisions and later enacted provisions control those earlier in time. (*County of Placer* v. *Aetna Cas. etc. Co.* (1958) 50 Cal.2d 182, 189 [323 P.2d 753];

---

[4]Santa Monica Municipal Code section 4608 provides in pertinent part as follows: "Prior to the beginning of each fiscal year, July 1, the Rent Control Board shall hold a public hearing on a proposed budget for the Rent Control Administration for said fiscal year, and shall adopt a budget. Copies of the adopted budget shall be filed with the City Clerk, Controller, and City Manager. From the effective date of the budget, the amount stated therein as proposed expenditures shall be and become appropriated by the Board to the Rent Control Administration for the respective objects and purposes therein stated. . . ."

Santa Monica Municipal Code section 4611 provides: "Legal Staff hired by the Rent Control Board shall represent and advise the Rent Control Board and its staff in any or all actions in which the Board or its staff, in or by reason of their official capacity, are concerned or are a party."

[5]Charter, article XIII, section 1303 provides as follows: "The City Council by ordinance may assign additional functions or duties to offices, departments or agencies established by this Charter, but may not discontinue or assign to any other office, department or agency any function or duty assigned by this Charter to a particular office, department, or agency."

*City of Petaluma* v. *Pacific Tel. & Tel. Co.* (1955) 44 Cal.2d 284, 288 [282 P.2d 43]; *Diamond International Corp.* v. *Boas* (1979) 92 Cal.App.3d 1015, 1031 [155 Cal.Rptr. 616].)

 At this juncture, we also point out that, although the legislative power under our constitutional framework is firmly vested in the Legislature, "the people reserve to themselves the powers of initiative and referendum." (Cal.Const., art. IV, § 1.) It follows from this that, " '[the] power of initiative must be liberally construed . . . to promote the democratic process.' " (*San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 210, fn. 3 [118 Cal.Rptr. 146, 529 P.2d 570]; see also *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281].) It is a general rule of statutory construction that a court will interpret a measure adopted by a vote of the people in such a manner as to give effect to the intent of the electorate. (*Diamond International Corp.* v. *Boas, supra,* at pp. 1033-1034.) " 'The words must be read in a sense which harmonizes with the subject-matter and the general purpose and object of the amendment, consistent of course with the language itself. The words must be understood, not as the words of the civil service commission, or the city council, or the mayor, or the city attorney, but as the words of the voters who adopted the amendment. They are to be understood in the common popular way, and, in the absence of some strong and convincing reason to the contrary, not found here, they are not entitled to be considered in a technical sense inconsistent with their popular meaning.' " (*Burger* v. *Employees' Retirement System* (1951) 101 Cal.App.2d 700, 702-703 [226 P.2d 38].) To ascertain the intent of the electorate it is, of course, proper to consider the official statements made to the voters in connection with propositions of law they are requested to approve or reject. (See *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 653 [298 P.2d 1]; *State of California* v. *Superior Court* (1962) 208 Cal.App.2d 659, 664 [25 Cal.Rptr. 363].)

Bearing in mind the foregoing interpretive aids, we briefly review the political and social millieu that existed at the time the rent control intitiative came before the voters.

In 1976, the California Supreme Court held in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001], that rent control was a constitutional exercise of the traditional police powers of municipalities. Shortly thereafter, in light of inflationary trends and the continual rise in rental costs, combined with the growing phenomenon of condominium conversion, numerous California cities began considering the enactment of rent controls.

Proposition A, the current Charter amendment, was placed on the ballot by initiative at the 1979 municipal election. Ballot arguments by proponents of the initiative measure referred to the hostility of the City Council to any form of meaningful rent control.[6] In fact, the City's mayor endorsed the ballot statement opposing the measure. Proposition A was approved by the voters at the general municipal election of April 10, 1979.

 After thoroughly reviewing the language of the Charter amendment and the events that led to its passage, we are convinced that the electorate intended to have the rent control law exclusively administered by a popularly elected Rent Control Board independent of City Council interference or control. That the voters intended the Board to be autonomous in budgetary and legal affairs is clearly evidenced by those provisions of the Charter amendment that confer upon the Board the authority to impose fees (§ 1803(n)), enforce the law (§§ 1809-1811), and employ a regular staff (§ 1803(f)(6)).

We agree with defendants and real party in interest that the power to appropriate funds and adopt a budget constrains the ability to determine the level of service necessary to carry out the programs and achieve the goals of the Board. The power to direct the course of legal matters is critical to effective enforcement of the rent control laws. It was intended by the voters that the Board, and not the City Council, exercise these basic functions. The language of the Charter with respect to financing and legal matters, and the legislative history before and after the enactment of the Charter amendment, compels the conclusion, consistent with well-established rules of statutory construction, that the Board is autonomous in fiscal and legal affairs. As made clear by the City and the Board in their respective briefs, any other construction would undermine the salient purpose of having an elected rather than an appointed agency.

Section 1803(n) of the Charter amendment[7] defines and limits the City Council's authority to fund the Board's operations for the six months ending

---

[6]As stated in the official ballot pamphlet mailed to all registered voters before the election: "Santa Monica is confronted with a severe housing crisis. [] The crisis was recently documented by the Rental Housing Mediation Coordinator for Santa Monica, who reported . . . a portion of the tenant population is experiencing high rent increases and evictions without cause. [] The Santa Monica City Council has failed to come to grips with the problem. That is why more than 9,000 signatures were collected during an unprecedented 7-week petition campaign by supporters of renters' rights. Proposition A appears on the ballot by popular demand."

[7]Section 1803(n) provides: "The Board shall finance its reasonable and necessary expenses by charging landlords annual registration fees in amounts deemed reasonable by the Board. The first annual registration fee shall be set by the Board within thirty days after assuming office. The Board is also empowered to request and receive funding when and if necessary, from any available source for its reasonable and necessary expenses. Notwithstanding the

in October 1979. The Board's power to finance or fund its own operations and to determine the amount of the registration fees to be charged landlords encompasses and necessarily includes the power to budget or plan its expenditures. The trial court's ruling, requiring the City Council to adopt a budget for the Board, rendered the phrase "[t]he Board shall finance its reasonable and necessary expenses by charging . . . fees" meaningless.

The budgetary autonomy of the Board is integral to the implementation of the rent control law. The Board is a rule-making and adjudicatory agency, with its own hearing examiners and enforcement arm. Its decisions are directly reviewable by the courts. (§ 1808.) The Board is specifically empowered to raise fees to cover its reasonable expenses. Under the circumstances, we can only conclude that the voters intended for the Board, and not the City Council, to control its own budgetary policies.

Similar considerations also lead us to the conclusion that the Board possesses the legal authority to employ its own legal staff. The broad mandate of section 1803(p)[8] places no limit upon the kind of staff the Board may employ. It requires only that the Board be guided in its staffing decisions by considerations of efficiency and the purpose of the charter amendment. Virtually all of the substantive functions of the Board, including rule-making, administrative proceedings, and actions in the courts, require legal advice and representation. An elected entity that makes judicially reviewable decisions and that is a party to judicial proceedings clearly possesses the right to the services of an attorney of its choosing and subject to its control.

We recognize that the Charter amendment does not expressly specify whether the Board is to be represented by an independent legal staff or the City attorney. When we consider the intent of the electorate, however, we think it clear that the Board, if it is to remain a truly autonomous body, must be entitled to the legal counsel of its own choosing. The Board, unlike other City agencies and departments, is composed of popularly elected commissioners who have the authority under the charter amendment to initiate legal action and determine the course of any litigation affecting the rent control laws. The Board, not the City or the City Council, is the "client" that is entitled to legal representation in such instances. The City attorney, however, provides legal advice to the City's appointed boards and commis-

---

preceding provisions of this paragraph, the City Council of the City of Santa Monica shall appropriate sufficient funds for the reasonable and necessary expenses of the Interim Board and Board during the six month period following adoption of this Article."

[8]Section 1803(p) of the Charter amendment reads as follows: "The Board shall employ and pay such staff including hearing examiners and inspectors, as may be necessary to perform its functions efficiently in order to fulfill the purposes of this Article."

sions. For the most part, these municipal agencies are not empowered to initiate legal action. The City Council therefore has control of all litigation concerning these agencies, and the Council and its members constitute the "client" whom the City attorney represents when the City is a party to legal action. Under the circumstances, it is the innate characteristics and functions of the Board that entitle it to employ an independent legal staff.

As we see it, the City Council, by enacting the ordinances in question, has done nothing more than clarify and implement the intent of the electorate. ■ It is well established that where the voters have altered their charter by initiative measure, but the terms of the amendment are ambiguous when read with existing law, the legislative body may interpret the initiative in order to harmonize it with existing law. (See *California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171, 178 [148 Cal.Rptr. 875, 583 P.2d 729].)

■ In determining the validity of an ordinance or a statute, the presumption is that the enactment is valid. (*Galligan* v. *City of San Bruno* (1982) 132 Cal.App.3d 869, 873 [183 Cal.Rptr. 466].) "'. . . "Where ordinances or bylaws have been enacted pursuant to competent authority they will be supported by every reasonable intendment and reasonable doubts as to their validity will be resolved in their favor. Courts are bound to uphold municipal ordinances and bylaws unless they manifestly transcend the powers of the enacting body."'" (*Brown* v. *City of Berkeley* (1976) 57 Cal.App.3d 223, 231 [129 Cal.Rptr. 1]; see also *Acton* v. *Henderson* (1957) 150 Cal.App.2d 1, 14 [309 P.2d 481].)

■ The citizens of Santa Monica, exercising the power of the initiative, resolved the fundamental policy questions in this case by enacting the Charter amendment provisions empowering the Board to regulate rents, finance its necessary and reasonable expenses through fees, and employ and pay its own staff. The City Council simply clarified this amendment and provided a means of implementation by adopting a series of ordinances directing the Board to adopt a budget after public hearing and affirming the authority of the Board to employ independent legal counsel.

Contrary to plaintiff's contention there was no improper delegation of authority by the Council or the City attorney. The authority was delegated by the electorate through the device of an initiative amendment to the Charter.

By adopting the Charter amendment, the Santa Monica electorate enacted basic policies as to how the system of rent control within the City should

be administered. The City Council, by the passage of various implementing ordinances, sought to effect the intent of the voters and clarify any existing ambiguities. In so doing, the Council carefully integrated the administration of the rent control laws into the structure of city government. The choice of the people and the Council in this regard cannot be said clearly and unequivocally to violate the mandate of the City Charter. In keeping with salutary constitutional principles we must therefore defer to these legislative judgments as a matter of separation of powers. (See *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 450 [202 P.2d 38, 7 A.L.R.2d 990]; *City of Santa Monica* v. *Grubb* (1966) 245 Cal.App.2d 718, 720 [54 Cal.Rptr. 210]; *Armas* v. *City of Oakland* (1933) 135 Cal.App.411 [27 P.2d 666].)

The judgment is reversed.

Beach, J., and Gates, J., concurred.