160 Cal.App.3d 1011 (1984)
207 Cal. Rptr. 78
KAREN CREIGHTON et al., Plaintiffs and Respondents,
v.
CITY OF SANTA MONICA, et al., Defendants and Appellants; SANTA MONICA RENT CONTROL BOARD, Real Party in Interest and Appellant.
Docket No. B003559.
Court of Appeals of California, Second District, Division Two.
October 12, 1984.
*1013 COUNSEL
Robert M. Myers, City Attorney, Stephen S. Stark, Assistant City Attorney, Karl M. Manheim and Martin T. Tachiki, Deputy City Attorneys, for Defendants and Appellants.
Michael Heumann, Stephen P. Wiman, Marsha Jones Moutrie, Joel Martin Levy and Barbara O'Hearn for Real Party in Interest and Appellant.
*1014 Stacey & Jones, Sherman Stacey, David M. Shell and Craig Mordoh for Plaintiffs and Respondents.
OPINION
COMPTON, Acting P.J.
In April 1979, the Santa Monica City electorate amended its city charter by initiative measure establishing a comprehensive system of controls on residential rents. To administer this system the amendment provided for the creation of a permanent rent control board (Board), consisting of five popularly elected commissioners, with the authority to regulate maximum rents and to issue permits for the removal of rental units from the rental housing market. The new charter provision specifically empowered the Board to "hire and pay necessary staff" (Santa Monica City Charter, art. XVIII, § 1803(f)(6)) and to "finance its reasonable and necessary expenses by charging landlords annual registration fees." (Santa Monica City Charter (Charter), art. XVIII, § 1803(n).) By a series of subsequently enacted ordinances, the Santa Monica City Council affirmed the authority of the Board to determine its financial and personnel policies. As a result, since 1979, the Board has adopted its own budget and retained the services of eight staff attorneys to represent it in well over three hundred cases.
Some four years later, in November 1983, plaintiffs instituted a taxpayers action[1] against defendants City of Santa Monica (City), various municipal officers, and the Board, as real party in interest, challenging the Board's legal authority to formulate its own budget and hire an independent legal staff. Plaintiffs' generally contended that there had been an illegal expenditure of public funds and an unlawful delegation by the City attorney of his official duties. The superior court, ruling in favor of plaintiffs, enjoined the Board from continuing to adopt its own budget and directed the City attorney to begin representing the Board in all legal matters. Defendants and real party in interest appeal, arguing that the trial court exceeded its jurisdiction by deciding a purely legislative matter and erroneously ignored the intent of the electorate in interpreting the City Charter. We agree and therefore reverse the judgment.[2]
*1015 The City is a municipal corporation organized under the laws and Constitution of the State of California and freeholders' charter adopted November 5, 1946, under sections 3 and 5 of article XI of the state Constitution. The Charter itself establishes a "Council-Manager" form of government, under which the City Council is vested with all powers of the city except as limited by the Charter and the state Constitution. The Council may confer additional powers on other charter agencies, but may not take away powers specifically conferred by the Charter. The City Manager is designated the chief executive officer and head of the administrative branch of the city government, responsible to the Council for the proper administration of all affairs of the City.
The Charter further establishes a general budgetary process under which the City Manager is to prepare and transmit to the Council a proposed budget based on estimates of revenue and expenditures received from each of the various City departments. The Council is then to consider the proposed budget, make appropriate revisions and, following public hearing, adopt a budget.
The adoption of the budget is, of course, the primary tool by which the City Council translates policy into action. The Council projects revenues and determines levels of fees and taxes. It appropriates funds for mandatory costs, basic City services, and discretionary programs. It authorizes expenditures for personnel, ordinary expenses, and capital improvements desired in the forthcoming fiscal year. Each agency and department is therefore required to submit a detailed work program delineating its goals, specific objectives, and other miscellaneous budget items necessary to carry out its mission.
Following adoption of the budget, the City controller audits requests for expenditures by the city departments to insure that funds have been appropriated. The City treasurer may then issue warrants on City accounts.
The City attorney, who serves at the pleasure of the Council and is subject to its control, generally conducts the legal business of the City. The holder of this office is responsible for giving legal advice and making tactical decisions in all litigation matters. The Council, however, retains the authority for making final decisions as to the prosecution, settlement, or appeal of all civil cases involving the City.
Article X of the Charter provides for the establishment of certain specific boards and commissions, whose members are appointed by the Council. Other appointed City departments have been established by ordinance. Pursuant to article XIII of the Charter, the Council may confer additional duties *1016 upon a commission or board established under the Charter, but may not detract from the Charter-prescribed functions of officers and agencies. None of these appointed agencies possess the authority to impose fees, adopt budgets, hire staff, or sue and be sued. The City attorney furnishes legal advice and representation to these agencies.
At the heart of the controversy in the instant case is the Santa Monica Rent Control Law as set forth in article XVIII, sections 1800-1812 of the City Charter. This amendment to the Charter was proposed by initiative, was adopted by the City electorate on April 10, 1979, and took effect immediately upon passage.[3]
The measure specifically provides for the establishment of an elected Rent Control Board and assigns to it duties including the registration of all controlled rental units, the establishment and adjustment of fair and equitable rent levels for those units, and the issuance of permits for the removal of controlled units. (§ 1803.) The Board is expressly given the power to issue necessary rules and regulations, and to hire and pay necessary staff. (§§ 1803(f)(6), 1803(g).) The Board is empowered and required to charge landlords annual registration fees in amounts it deems reasonable in order to finance its reasonable and necessary expenses. (§ 1803(n).)
Shortly after the passage of the amendment, the City Council adopted Ordinance No. 1127 to codify, clarify and implement article XVIII and "to integrate it into the whole of the City, its government, law and plans." This ordinance provided, inter alia, that the City Manager and City staff were to administer and supervise the Board's financial, personnel and purchasing affairs. Ordinance No. 1127 did, however, recognize the Board's final appointing authority over its employees. Although the Board was required to submit a budget in the same manner as other City departments, its budget was to be approved as transmitted except the Council reserved the power to disapprove items requiring the expenditure of general funds or involving "a manifestly unreasonable use of public resources or manifestly unreasonable risk of loss to the City." Suits against the Board were to be considered suits against the city and defended by the City attorney.
In April 1980 and December 1982, Ordinance No. 1127 was extensively amended by the City Council. The newly adopted ordinances, codified as sections 4601-4615 of the Santa Monica Municipal Code, placed the power to administer and supervise financial, personnel, and purchasing affairs with the Board and its staff. Specifically, Ordinance Nos. 1153 and 1265 recognized *1017 the Board's authority to hire its own legal staff and, following a public hearing, to adopt its own budget.[4]
In challenging the Board's legal authority to act autonomously, plaintiffs generally rely upon those provisions of the Charter that prohibit both the City Council and City attorney from delegating any of their prescribed duties.[5] Both defendants and real party in interest argue, however, that the rent control laws may be harmonized with the general Charter provisions so as to give effect to the will of the electorate and thus allow the Board to maintain its independence from other municipal agencies.
(1) A city's charter is, of course, the equivalent of a local constitution. It is the supreme organic law of the city, subject only to conflicting provisions in the federal and state constitutions and to preemptive state law. (San Francisco Fire Fighters v. City and County of San Francisco (1977) 68 Cal. App.3d 896, 898 [137 Cal. Rptr. 607]; Brown v. City of Berkeley (1970) 57 Cal. App.3d 223, 231 [129 Cal. Rptr. 1].) "[Charter] cities may make and enforce all ordinances and regulations subject only to restrictions and limitations imposed in their several charters.... Within its scope, such a charter is to a city what the state Constitution is to the state." (Campen v. Greiner (1971) 15 Cal. App.3d 836, 840 [93 Cal. Rptr. 525].)
(2) Under settled rules of statutory interpretation, the various sections of a charter must be construed together, giving effect and meaning so far as possible to all parts thereof, with the primary purpose of harmonizing them and effectuating the legislative intent as therein expressed. (Hanley v. Murphy (1953) 40 Cal.2d 572, 576 [255 P.2d 1].) Where it is impossible to reconcile conflicting provisions, special provisions control more general provisions and later enacted provisions control those earlier in time. (County of Placer v. Aetna Cas. etc. Co. (1958) 50 Cal.2d 182, 189 [323 P.2d 753]; *1018 City of Petaluma v. Pacific Tel. & Tel. Co. (1955) 44 Cal.2d 284, 288 [282 P.2d 43]; Diamond International Corp. v. Boas (1979) 92 Cal. App.3d 1015, 1031 [155 Cal. Rptr. 616].)
(3) At this juncture, we also point out that, although the legislative power under our constitutional framework is firmly vested in the Legislature, "the people reserve to themselves the powers of initiative and referendum." (Cal.Const., art. IV, § 1.) It follows from this that, "`[the] power of initiative must be liberally construed ... to promote the democratic process.'" (San Diego Bldg. Contractors Assn. v. City Council (1974) 13 Cal.3d 205, 210, fn. 3 [118 Cal. Rptr. 146, 529 P.2d 570]; see also Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 219 [149 Cal. Rptr. 239, 583 P.2d 1281].) (4) It is a general rule of statutory construction that a court will interpret a measure adopted by a vote of the people in such a manner as to give effect to the intent of the electorate. (Diamond International Corp. v. Boas, supra, at pp. 1033-1034.) "`The words must be read in a sense which harmonizes with the subject-matter and the general purpose and object of the amendment, consistent of course with the language itself. The words must be understood, not as the words of the civil service commission, or the city council, or the mayor, or the city attorney, but as the words of the voters who adopted the amendment. They are to be understood in the common popular way, and, in the absence of some strong and convincing reason to the contrary, not found here, they are not entitled to be considered in a technical sense inconsistent with their popular meaning.'" (Burger v. Employees' Retirement System (1951) 101 Cal. App.2d 700, 702-703 [226 P.2d 38].) To ascertain the intent of the electorate it is, of course, proper to consider the official statements made to the voters in connection with propositions of law they are requested to approve or reject. (See Lundberg v. County of Alameda (1956) 46 Cal.2d 644, 653 [298 P.2d 1]; State of California v. Superior Court (1962) 208 Cal. App.2d 659, 664 [25 Cal. Rptr. 363].)
Bearing in mind the foregoing interpretive aids, we briefly review the political and social millieu that existed at the time the rent control intitiative came before the voters.
In 1976, the California Supreme Court held in Birkenfeld v. City of Berkeley (1976) 17 Cal.3d 129 [130 Cal. Rptr. 465, 550 P.2d 1001], that rent control was a constitutional exercise of the traditional police powers of municipalities. Shortly thereafter, in light of inflationary trends and the continual rise in rental costs, combined with the growing phenomenon of condominium conversion, numerous California cities began considering the enactment of rent controls.
*1019 Proposition A, the current Charter amendment, was placed on the ballot by initiative at the 1979 municipal election. Ballot arguments by proponents of the initiative measure referred to the hostility of the City Council to any form of meaningful rent control.[6] In fact, the City's mayor endorsed the ballot statement opposing the measure. Proposition A was approved by the voters at the general municipal election of April 10, 1979.
(5a) After thoroughly reviewing the language of the Charter amendment and the events that led to its passage, we are convinced that the electorate intended to have the rent control law exclusively administered by a popularly elected Rent Control Board independent of City Council interference or control. That the voters intended the Board to be autonomous in budgetary and legal affairs is clearly evidenced by those provisions of the Charter amendment that confer upon the Board the authority to impose fees (§ 1803(n)), enforce the law (§§ 1809-1811), and employ a regular staff (§ 1803(f)(6)).
We agree with defendants and real party in interest that the power to appropriate funds and adopt a budget constrains the ability to determine the level of service necessary to carry out the programs and achieve the goals of the Board. The power to direct the course of legal matters is critical to effective enforcement of the rent control laws. It was intended by the voters that the Board, and not the City Council, exercise these basic functions. The language of the Charter with respect to financing and legal matters, and the legislative history before and after the enactment of the Charter amendment, compels the conclusion, consistent with well-established rules of statutory construction, that the Board is autonomous in fiscal and legal affairs. As made clear by the City and the Board in their respective briefs, any other construction would undermine the salient purpose of having an elected rather than an appointed agency.
Section 1803(n) of the Charter amendment[7] defines and limits the City Council's authority to fund the Board's operations for the six months ending *1020 in October 1979. The Board's power to finance or fund its own operations and to determine the amount of the registration fees to be charged landlords encompasses and necessarily includes the power to budget or plan its expenditures. The trial court's ruling, requiring the City Council to adopt a budget for the Board, rendered the phrase "[t]he Board shall finance its reasonable and necessary expenses by charging ... fees" meaningless.
The budgetary autonomy of the Board is integral to the implementation of the rent control law. The Board is a rule-making and adjudicatory agency, with its own hearing examiners and enforcement arm. Its decisions are directly reviewable by the courts. (§ 1808.) The Board is specifically empowered to raise fees to cover its reasonable expenses. Under the circumstances, we can only conclude that the voters intended for the Board, and not the City Council, to control its own budgetary policies.
Similar considerations also lead us to the conclusion that the Board possesses the legal authority to employ its own legal staff. The broad mandate of section 1803(p)[8] places no limit upon the kind of staff the Board may employ. It requires only that the Board be guided in its staffing decisions by considerations of efficiency and the purpose of the charter amendment. Virtually all of the substantive functions of the Board, including rule-making, administrative proceedings, and actions in the courts, require legal advice and representation. An elected entity that makes judicially reviewable decisions and that is a party to judicial proceedings clearly possesses the right to the services of an attorney of its choosing and subject to its control.
We recognize that the Charter amendment does not expressly specify whether the Board is to be represented by an independent legal staff or the City attorney. When we consider the intent of the electorate, however, we think it clear that the Board, if it is to remain a truly autonomous body, must be entitled to the legal counsel of its own choosing. The Board, unlike other City agencies and departments, is composed of popularly elected commissioners who have the authority under the charter amendment to initiate legal action and determine the course of any litigation affecting the rent control laws. The Board, not the City or the City Council, is the "client" that is entitled to legal representation in such instances. The City attorney, however, provides legal advice to the City's appointed boards and commissions. *1021 For the most part, these municipal agencies are not empowered to initiate legal action. The City Council therefore has control of all litigation concerning these agencies, and the Council and its members constitute the "client" whom the City attorney represents when the City is a party to legal action. Under the circumstances, it is the innate characteristics and functions of the Board that entitle it to employ an independent legal staff.
As we see it, the City Council, by enacting the ordinances in question, has done nothing more than clarify and implement the intent of the electorate. (6) It is well established that where the voters have altered their charter by initiative measure, but the terms of the amendment are ambiguous when read with existing law, the legislative body may interpret the initiative in order to harmonize it with existing law. (See California Housing Finance Agency v. Patitucci (1978) 22 Cal.3d 171, 178 [148 Cal. Rptr. 875, 583 P.2d 729].)
(7) In determining the validity of an ordinance or a statute, the presumption is that the enactment is valid. (Galligan v. City of San Bruno (1982) 132 Cal. App.3d 869, 873 [183 Cal. Rptr. 466].) "`... "Where ordinances or bylaws have been enacted pursuant to competent authority they will be supported by every reasonable intendment and reasonable doubts as to their validity will be resolved in their favor. Courts are bound to uphold municipal ordinances and bylaws unless they manifestly transcend the powers of the enacting body."'" (Brown v. City of Berkeley (1976) 57 Cal. App.3d 223, 231 [129 Cal. Rptr. 1]; see also Acton v. Henderson (1957) 150 Cal. App.2d 1, 14 [309 P.2d 481].)
(5b) The citizens of Santa Monica, exercising the power of the initiative, resolved the fundamental policy questions in this case by enacting the Charter amendment provisions empowering the Board to regulate rents, finance its necessary and reasonable expenses through fees, and employ and pay its own staff. The City Council simply clarified this amendment and provided a means of implementation by adopting a series of ordinances directing the Board to adopt a budget after public hearing and affirming the authority of the Board to employ independent legal counsel.
Contrary to plaintiff's contention there was no improper delegation of authority by the Council or the City attorney. The authority was delegated by the electorate through the device of an initiative amendment to the Charter.
By adopting the Charter amendment, the Santa Monica electorate enacted basic policies as to how the system of rent control within the City should *1022 be administered. The City Council, by the passage of various implementing ordinances, sought to effect the intent of the voters and clarify any existing ambiguities. In so doing, the Council carefully integrated the administration of the rent control laws into the structure of city government. The choice of the people and the Council in this regard cannot be said clearly and unequivocally to violate the mandate of the City Charter. In keeping with salutary constitutional principles we must therefore defer to these legislative judgments as a matter of separation of powers. (See Lockard v. City of Los Angeles (1949) 33 Cal.2d 453, 450 [202 P.2d 38, 7 A.L.R.2d 990]; City of Santa Monica v. Grubb (1966) 245 Cal. App.2d 718, 720 [54 Cal. Rptr. 210]; Armas v. City of Oakland (1933) 135 Cal. App.411 [27 P.2d 666].)
The judgment is reversed.
Beach, J., and Gates, J., concurred.

*1023 APPENDIX

 SANTA MONICA CHARTER 248-1
 ------------------------------------------------------------
 R-62
 ARTICLE XVIII - RENT CONTROL LAW
Article XVIII SECTION 1800. Statement of Purpose. A growing shortage
adopted at of housing units resulting in a low vacancy rate and
General Municipal rapidly rising rents exploiting this shortage constitute
Election, a serious housing problem affecting the lives of a
April 10, substantial portion of those Santa Monica residents who
1979, Res. reside in residential housing. In addition, speculation
5383 (CCS). in the purchase and sale of existing residential housing
 units results in further rent increases. These conditions
 endanger the public health and welfare of Santa Monica
 tenants, especially the poor, minorities, students, young
 families, and senior citizens. The purpose of this
 Article, therefore, is to alleviate the hardship caused
 by this serious housing shortage by establishing a Rent
 Control Board empowered to regulate rentals in the City
 of Santa Monica so that rents will not be increased
 unreasonably and so that landlords will receive no more
 than a fair return on their investment.
 In order to accomplish this purpose, this Article
 provides for an elected rent control board to ensure that
 rents are at a fair level by requiring landlords to
 justify any rents in excess of the rents in effect one
 year prior to the adoption of this Article. Tenants may
 seek rent reductions from the rent in effect one year
 prior to the adoption of this Article by establishing
 that those rents are excessive. In addition to giving
 tenants an opportunity to contest any rent increase, this
 Article attempts to provide reasonable protection to
 tenants by controlling removal of controlled rental units
 from the housing market and by requiring just cause for
 any eviction from a controlled rental unit.
 SECTION 1801. Definitions. The following words or
 phrases as used in this Article shall have the following
 meanings:
 (a) Board. "Board" refers to the appointed or elected
 rent control board established by this Article.
 (b) Commissioners. The members of the Board and interim
 Board are denominated Commissioners.
 (c) Controlled Rental Units. All residential rental
 units in the City of Santa Monica, including mobile homes
 and mobile home spaces, and trailers and trailer spaces,
 except:
 (1) Rental units in hotels, motels, inns, tourist homes
 and rooming and boarding houses which are rented
 primarily to transient guests for a period of less than
 fourteen (14) days.
 (2) Rental units in any hospital, convent, monastery,
 extended medical care facility, asylum, non-profit home
 for the aged, or dormitory owned and operated by an
 institution of higher education.
 (3) Rental units which a government unit, agency or
 authority owns, operates, manages or in which
 governmentally-subsidized tenants reside only if
 applicable Federal or State law or administrative
 regulation specifically exempt such units from municipal
 rent control.
 (4) Rental units in owner occupied dwellings with no
 more than three (3) units.
 (5) Rental units and dwellings constructed after the
 adoption of this Article: this exemption does not apply
 to units created as a result of conversion as opposed to
 new construction.
 (d) Housing Service. Housing services include but are
 not limited to repairs, maintenance, painting, providing
 light, hot and cold water, elevator service, window
 shades and screens, storage, kitchen, bath and laundry
 facilities and privileges, janitor services, refuse
 removal, furnishings, telephone, parking and any other
 benefit, privilege or facility connected with the use or
 occupancy of any rental unite. Services to a rental unit
 shall include a proportionate part of services provided
 to common facilities of the building in which the rental
 unit is contained.
 (e) Landlord. An owner, lessor, sublessor or any other
 person entitled to receive rent for the use and occupancy
 of any rental unit, or an agent, representative or
 successor of any of the foregoing.
 (f) Rent. All periodic payments and all nonmonetary
 consideration, including but not limited to, the fair
 market value of goods or services rendered to or for the
 benefit of the landlord under an agreement concerning the
 use or occupancy of a rental unit and premises, including
 all payments and consideration demanded or paid for
 parking, pets, furniture, subletting and security
 deposits for damages and cleaning.
 (g) Rental Housing Agreement. An agreement, oral,
 written or implied, between a landlord and tenant for use
 or occupancy of a rental unit and for housing services.
 (h) Rental Units. Any building, structure, or part
 thereof, or land appurtenant thereto, or any other rental
 property rented or offered for rent for living or
 dwelling house units, and other real properties used for
 living or dwelling purposes, together with all housing
 services connected with use or occupancy of such property
 such as common areas and recreational facilities held out
 for use by the tenant.
 (i) Tenant. A tenant, subtenant, lessee, sublessee or
 any other person entitled under the terms of a rental
 housing agreement to the use or occupancy of any rental
 unit.
 (j) Recognized Tenant Organization. Any group of
 tenants, residing in controlled rental units in the same
 building or in different buildings operated by the same
 management company, agent or landlord, who requests to
 be so designated.
 (k) Rent Ceilings. Rent ceiling refers to the limit on
 the maximum allowable rent which a
*1024 SANTA MONICA CHARTER 248-2
 ------------------------------------------------------------
 R-62
 landlord may charge on any controlled rental unit.
 (l) Base Rent Ceiling. The maximum allowable rent
 established in Section 1804(b).
 SECTION 1802. Interim Rent Control Board. No later than
 thirty (30) days after the adoption of this Article, the
 City Council of the City of Santa Monica shall appoint a
 five-member Interim Rent Control Board. No person shall
 be appointed to the Interim Rent Control Board unless he
 or she is a duly qualified elector of the City of Santa
 Monica. The Interim Board shall exercise the following
 powers and duties until the Permanent Board is elected in
 accordance with the provisions of Section 1803(d) and
 assumes office:
 (1) Require registration of all controlled rental units
 under Section 1803(q).
 (2) Seek criminal penalties under Section 1810.
 (3) Seek injunctive relief under Section 1811.
 SECTION 1803. Permanent Rent Control Board.
 (a) Composition. There shall be in the City of Santa
 Monica a Rent Control Board. The Board shall consist of
 five elected Commissioners. The Board shall elect
 annually as chairperson one of its members to serve in
 that capacity.
 (b) Eligibility. Duly qualified electors of the City of
 Santa Monica are eligible to serve as Commissioners of
 the Board.
 (c) Full Disclosure of Holdings. Candidates for the
 position of Commissioner shall submit a verified
 statement listing all of their interests and dealings in
 real property, including but not limited to its
 ownership, sale or management, during the previous three
 (3) years.
 (d) Election of Commissioners. Commissioners shall be
 elected at general municipal elections in the same manner
 as set forth in Article XIV of the Santa Monica City
 charter, except that the first Commissioners shall be
 elected at a special municipal election held within
 ninety (90) days of the adoption of this Article. The
 elected Commissioners shall take office on the first
 Tuesday following their election.
 (e) Term of Office. Commissioners shall be elected to
 serve terms of four years, beginning on the first Tuesday
 following their election, except that of the first five
 Commissioners elected in accordance with Section 1803
 (d), the two Commissioners receiving the most votes shall
 serve until April 15, 1985 and the remaining three
 commissioners shall serve until April 18, 1983.
 Commissioners shall serve a maximum of two full terms.
 (f) Powers and Duties. The Board shall have the
 following powers and duties:
 (1) Set the rent ceilings for all controlled rental
 units.
 (2) Require registration of all controlled rental units
 under Section 1803(q).
 (3) Establish a base ceiling on rents under Section
 1804(b).
 (4) To make adjustments in the rent ceiling in
 accordance with Section 1805.
 (5) Set rents at fair and equitable levels in order to
 achieve the intent of this Article.
 (6) Hire and pay necessary staff, including hearing
 examiners and personnel to issue orders, rules and
 regulations, conduct hearings and charge fees as set
 forth below.
 (7) Make such studies, surveys and investigations,
 conduct such hearings, and obtain such information as is
 necessary to carry out its powers and duties.
 (8) Report annually to the City Council of the City of
 Santa Monica on the status of controlled rental housing.
 (9) Remove rent controls under Section 1803(r).
 (10) Issue permits for removal of controlled rental
 units from rental housing market under Section 1803(t).
 (11) Administer oaths and affirmations and subpoena
 witnesses.
 (12) Establish rules and regulations for deducting
 penalties and settling civil claims under Section 1809.
 (13) Seek criminal penalties under Section 1810.
 (14) Seek injunctive relief under Section 1811.
 (g) Rules and Regulations. The Board shall issue and
 follow such rules and regulations, including those which
 are contained in this Article, as will further the
 purposes of the Article. The Board shall publicize its
 rules and regulations prior to promulgation in at least
 one newspaper of general circulation in the City of Santa
 Monica. The Board shall hold at least one (1) public
 hearing to consider the views of interested parties prior
 to the adoption of general adjustments of the ceilings
 for maximum allowable rents under Section 1805, and any
 decision to decontrol or re-impose control for any class
 of rental units under Section 1803(r). All rules and
 regulations, internal staff memoranda, and written
 correspondence explaining the decisions, orders, and
 policies of the Board shall be kept in the Board's office
 and shall be available to the public for inspection and
 copying. The Board shall publicize this Article so that
 all residents of Santa Monica will have the opportunity
 to become informed about their legal rights and duties
 under rent control in Santa Monica. The Board shall
 prepare a brochure which fully describes the legal rights
 and duties of landlords and tenants under rent control in
 Santa Monica. The brochure will be available to the
 public, and each tenant of a controlled rental unit shall
 receive a copy of the brochure from his or her landlord.
 (h) Meetings. The Board shall hold at least forty-eight
 (48) regularly scheduled meetings
*1025 SANTA MONICA CHARTER 248-3
 ------------------------------------------------------------
 R-62
 per year. Special meetings shall be called at the request
 of at least three Commissioners of the Board. The Board
 shall hold its initial meeting no later than fifteen (15)
 days after taking office.
 (i) Quorum. Three Commissioners shall constitute a
 quorum for the Board.
 (j) Voting. The affirmative vote of three Commissioners
 of the Board is required for a decision, including all
 motions, regulations, and orders of the Board.
 (k) Compensation. Each Commissioner shall receive for
 every meeting attended Seventy-Five ($75.00) Dollars, but
 in no event shall any Commissioner receive in any twelve
 month period more than Forty-seven Hundred and Fifty
 ($4,750.00) Dollars for services rendered.
 (l) Dockets. The Board shall maintain and keep in its
 office all hearing dockets.
 (m) Vacancies. If a vacancy shall occur on the Board,
 the Board shall within thirty (30) days appoint a
 qualified person to fill such a vacancy until the
 following municipal election when a qualified person
 shall be elected to serve for the remainder of the term.
 (n) Financing. The Board shall finance its reasonable
 and necessary expenses by charging landlords annual
 registration fees in amounts deemed reasonable by the
 Board. The first annual registration fee shall be set by
 the Board within thirty days after assuming office. The
 Board is also empowered to request and receive funding
 when if necessary, from any available source for its
 reasonable and necessary expenses. Notwithstanding the
 preceding provisions of this paragraph, the City Council
 of the City of Santa Monica shall appropriate sufficient
 funds for the reasonable and necessary expenses of the
 Interim Board and Board during the six month period
 following adoption of this Article.
 (o) Recall. Commissioners may be recalled in accordance
 with the provisions of Article XIV of the Charter of the
 City of Santa Monica.
 (p) Staff. The Board shall employ and pay such staff,
 including hearing examiners and inspectors, as may be
 necessary to perform its functions efficiently in order
 to fulfill the purposes of this Article.
 (q) Registration. Within sixty (60) days after the
 adoption of the Article, the Board shall require the
 registration of all controlled rental units, which shall
 be re-registered at times deemed appropriate by the
 Board. The initial registration shall include the rent in
 effect at the time on the date of the adoption of this
 Article, base rent ceiling, the address of the rental
 unit, the name and address of the landlord, the housing
 services provided to the unit, a statement indicating all
 operating cost increases since the base rent ceiling, and
 any other information deemed relevant by the Board. The
 Board shall require the landlord to report vacancies in
 the controlled rental units and shall make a list of
 vacant controlled rental units available to the public.
 If the Board, after the landlord has proper notice and
 after a hearing determines that a landlord has willfully
 and knowingly failed to register a controlled rental
 unit, the Board may authorize the tenant of such a
 nonregistered controlled rental unit to withhold all or a
 portion of the rent for the unit until such time as the
 rental unit is properly registered. After a rental unit
 is properly registered, the Board shall determine what
 portion, if any, of the withheld rent is owed to the
 landlord for the period in which the rental unit was not
 properly registered. Whether or not the board allows such
 withholding, no landlord who has failed to register
 properly shall at any time increase rents for a
 controlled rental unit until such units are properly
 registered.
 (r) Decontrol. If the average annual vacancy rate in
 any category, classification, or area of controlled
 rental units exceeds five (5) percent, the Board is
 empowered, at its discretion and in order to achieve the
 objectives of this Article to remove rent controls from
 such categories, classifications, or areas for purposes
 of decontrol consistent with the objectives of this
 Article. In determining the vacancy rate for any
 category, classification or area of controlled rental
 units, the Board shall consider all available data and
 shall conduct its own survey. If units are decontrolled
 pursuant to this subsection, controls shall be reimposed
 if the Board finds that the average annual vacancy rate
 has thereafter fallen below five (5) percent for such
 category, classification or area.
 (s) Security Deposits. Any payment or deposit of money
 the primary function of which is to secure the
 performance of a rental agreement or any part of such
 agreement, including an advance payment of rent, shall be
 placed in an interest bearing account at an institution
 whose accounts are insured by the Federal Saving and Loan
 Insurance Corporation until such time as it is returned
 to the tenant or entitled to be used by the landlord. The
 interest on said account shall be used by the landlord to
 offset operating expenses and shall be a factor in making
 individual rent adjustments under Section 1805. In lieu
 of complying with this requirement, the landlord may pay
 interest directly to the tenant in accordance with the
 requirements of any state law.
 (t) Removal of Controlled Rental Unit from Rental
 Housing Market. Any landlord who desires to remove a
 controlled rental unit from the rental housing market by
 demolition, conversion or other means is required to
 obtain a permit from the Board prior to such removal from
 the rental housing market in accordance with rules and
 regulations promulgated by the Board. In order to approve
*1026 SANTA MONICA CHARTER 248-4
 ------------------------------------------------------------
 R-62
 such a permits, the Board is required to make each of the
 following findings:
 (1) That the controlled rental unit is not occupied by
 a person or family of very low income, low income or
 moderate income.
 (2) That the rent of the controlled rental unit is not
 at a level affordable by a person or family of very low
 income, low income or moderate income.
 (3) That the removal of the controlled rental unit will
 not adversely affect the supply of housing in the City of
 Santa Monica.
 (4) That the landlord cannot make a fair return on
 investment by retaining the controlled rental unit.
 Notwithstanding the foregoing provisions of this
 subsection, the Board may approve such a permit:
 (1) If the Board finds that the controlled rental unit
 is uninhabitable and is incapable of being made habitable
 in an economically feasible manner, or
 (2) If the permit is being sought so that the property
 may be developed with multifamily dwelling units and the
 permit applicant agrees as a condition of approval that
 the units will not be exempt from the provisions of this
 Article pursuant to Section 1801(c) and that at least
 fifteen (15) percent of the controlled rental units to be
 built on the site will be at rents affordable by persons
 of low income.
 SECTION 1804. Maximum Allowable Rents.
 (a) Temporary Freeze. Rents shall not be increased
 during the one hundred-twenty (120) day period following
 the date of adoption of this Article.
 (b) Establishment of Base Rent Ceiling. Beginning
 one-hundred-twenty (120) days after the adoption of this
 Article, no landlord shall charge rent for any controlled
 rental units in an amount greater than the rent in
 effect on the date one year prior to the adoption of this
 Article. The rent in effect on that date is the base rent
 ceiling and is a reference point from which fair rents
 shall be adjusted upward or downward in accordance with
 Section 1805. If there was no rent in effect on the date
 one year prior to the adoption of this Article, the base
 rent ceiling shall be the rent that was charged on the
 first date that rent was charged following the date one
 year prior to the adoption of this Article.
 (c) Posting. As soon as the landlord is aware of the
 maximum allowable rent, the landlord shall post it for
 each unit in a prominent place in or about the affected
 controlled rent units. The Board may require that other
 information it deems relevant also be posted.
 SECTION 1805. Individual and General Adjustment of
 Ceilings on Allowable Rents.
 (a) The Board may, after holding those public hearings
 prescribed by Section 1803(g), set and adjust upward or
 downward the rent ceiling for all controlled rental units
 in general and/or for particular categories of controlled
 rental units deemed appropriate by the Board. Such an
 adjustment, however, need not take effect immediately,
 and the Board may decide that new rent ceilings shall not
 take effect until some reasonable date after the
 above-state time periods.
 (b) Each year the Board shall generally adjust rents as
 follows:
 (1) Adjust rents upward by granting landlords a utility
 and tax increase adjustment for actual increases in the
 City of Santa Monica for taxes and utilities.
 (2) Adjust rents upward by granting landlords a
 maintenance increase adjustment for actual increases in
 the City of Santa Monica for maintenance expenses.
 (3) Adjust rents downward by requiring landlords to
 decrease rents for any actual decreases in the City of
 Santa Monica for taxes.
 In adjusting rents under this subsection, the Board
 shall adopt a formula of general application. This
 formula will be based upon a survey of landlords of the
 increases or decreases in the expenses set forth in this
 subsection.
 (c) Petitions. Upon receipt of a petition by a landlord
 and/or tenant, the maximum rent of individual controlled
 rental units may be adjusted upward or downward in
 accordance with the procedures set forth elsewhere in
 this Section. The petition shall be on the form provided
 by the Board. Notwithstanding any other provision of this
 Section, the board or hearing examiner may refuse to hold
 a hearing and/or grant a rent adjustment if an individual
 hearing has been held and decision made with regard to
 maximum rent within the previous six months.
 (d) Hearing Procedure. The Board shall enact rules and
 regulations governing hearings and appeals of individual
 adjustment of ceilings on allowable rents which shall
 include the following:
 (1) Hearing Examiner. A hearing examiner appointed by
 the Board shall conduct a hearing to act upon the
 petition for individual adjustment of ceilings on
 allowable rents and shall have the power to administer
 oaths and affirmations.
 (2) Notice. The Board shall notify the landlord if the
 petition was filed by the tenant, or the tenant, if the
 petition was filed by the landlord, of the receipt of
 such a petition and a copy thereof.
 (3) Time of Hearing. The hearing officer shall notify
 all parties as to the time, date and place of the
 hearing.
*1027 SANTA MONICA CHARTER 248-5
 ------------------------------------------------------------
 R-62
 (4) Records. The hearing examiner may require either
 party to a rent adjustment hearing to provide it with any
 books, records and papers deemed pertinent in addition to
 that information contained in registration statements.
 The hearing examiner shall conduct a current building
 inspection and/or request the City to conduct a current
 building inspection if the hearing examiner finds good
 cause to believe the Board's current information does not
 reflect the current condition of the controlled rental
 unit. The tenant may request the hearing examiner to
 order such an inspection prior to the date of the
 hearing. All documents required under this Section shall
 be made available to the parties involved prior to the
 hearing at the office of the board. In cases where
 information filed in a petition for rent ceiling
 adjustment or in additional submissions filed at the
 request of the hearing examiner is inadequate or false,
 no action shall be taken on said petition until the
 deficiency is remedied.
 (5) Open Hearings. All rent ceiling adjustment hearings
 shall be open to the public.
 (6) Right of Assistance. All parties to a hearing may
 have assistance in presenting evidence and developing
 their position from attorneys, legal workers, recognized
 tenant organization representatives or any other persons
 designated by said parties.
 (7) Hearing Record. The Board shall make available for
 inspection and copying by any person an official record
 which shall constitute the exclusive record for decision
 on the issues at the hearing. The record of the hearing,
 or any part of one, shall be obtainable for the cost of
 copying. The record of the hearing shall include: all
 exhibits, papers and documents required to be filed or
 accepted into evidence during the proceedings; a list of
 participants present; a summary of all testimony accepted
 in the proceedings; a statement of all materials
 officially noticed; all recommended decisions, orders
 and/or rulings; all final decisions, order and/or
 rulings, and the reasons for each final decision, order
 and/or ruling. Any party may have the proceeding tape
 recorded or otherwise transcribed at his or her own
 expense.
 (8) Quantum of Proof and Notice of Decision. No
 individual adjustment shall be granted unless supported
 by the preponderance of the evidence submitted at the
 hearing. All parties to a hearing shall be sent a notice
 of the decision and a copy of the findings of fact and
 law upon which said decision is based. At the same time,
 parties to the proceeding shall also be notified of their
 right to any appeal allowed by the Board and/or to
 judicial review of the decision pursuant to this Section
 and Section 1808 of this Article.
 (9) Consolidation. All landlord petitions pertaining to
 tenants in the same building will be consolidated for
 hearing, and all petitions filed by tenants occupying the
 same building shall be consolidated for hearing unless
 there is a showing of good cause not to consolidate such
 petitions.
 (10) Appeal. Any person aggrieved by the decision of
 the hearing examiner may appeal to the Board. On appeal,
 the Board shall affirm, reverse or modify the decision of
 the hearing examiner. The Board may conduct a de novo
 hearing or may act on the basis of the record before the
 hearing examiner without holding a hearing.
 (11) Finality of Decision. The decision of the hearing
 examiner shall be the final decision of the Board in the
 event of no appeal to the Board. The decision of the
 hearing examiner shall not be stayed pending appeal;
 however, in the event that the Board on appeal reverses
 or modifies the decision of the hearing examiner, the
 landlord, in the case of an upward adjustment in rent, or
 the tenant, in the case of a downward adjustment of rent,
 shall be ordered to make retroactive payments to restore
 the parties to the position they would have occupied had
 the hearing examiner's decision been the same as that of
 the Board's.
 (12) Time for Decision. The rules and regulations
 adopted by the Board shall provide for final Board action
 on any individual rent adjustment petition within
 one-hundred and twenty (120) days following the date of
 filing of the individual rent adjustment petition.
 (13) Board Action in Lieu of Reference to Hearing
 Examiner. The Board, on its own motion or on the request
 of any landlord or tenant, may hold a hearing on an
 individual petition for rent adjustment without the
 petition first being heard by a hearing examiner.
 (e) In making individual and general adjustments of the
 rent ceiling, the Board shall consider the purposes of
 this Article and shall specifically consider all relevant
 factors including but not limited to increases or
 decreases in property taxes, unavoidable increases or
 decreases in operating and maintenance expenses, capital
 improvement of the controlled rental unit as
 distinguished from normal repair, replacement and
 maintenance, increases or decreases in living space,
 furniture, furnishings or equipment, substantial
 deterioration of the controlled rental unit other than as
 a result of ordinary wear and tear, failure of the part
 of the landlord to provide adequate housing services or
 to comply substantially with applicable housing, health
 and safety codes, federal and state income tax benefits,
 the speculative nature of the investment, whether or not
 the property was acquired or is held as a long term or
 short term investment, and the landlords rate of return
 on investment. It is the intent of this Article that
 upward adjustments in rent be made only when demonstrated
 necessary to the landlord making a fair return on
 investment.
*1028 SANTA MONICA CHARTER 248-6
 ------------------------------------------------------------
 R-62
 (f) No rent increase shall be authorized by this
 Article because a landlord has a negative cash flow as
 the result of refinancing the controlled rental unit if
 at the time the landlord refinanced the landlord could
 reasonably have foreseen a negative cash flow based on
 the rent schedule then in existence within the one year
 period following refinancing. This paragraph shall only
 apply to that portion of the negative cash flow
 reasonable forseeable within the one year period
 following refinancing of the controlled rental unit and
 shall only apply to controlled rental units refinanced
 after the date of adoption of this Article.
 (g) No rent increase shall be authorized by this
 Article because a landlord has a negative cash flow if at
 the time the landlord acquired the controlled rental
 unit, the landlord could reasonably have foreseen a
 negative cash flow based on the rent schedule then in
 existence within the one year period following
 acquisition. This paragraph shall only apply to that
 portion of the negative cash flow reasonably foreseeable
 within the one year period following acquisition of a
 controlled rental unit and shall only apply to controlled
 rental units acquired after the date of adoption of this
 Article.
 (h) No landlord shall increase rent under this Section
 of the landlord:
 (1) Has failed to comply with any provisions of this
 Article and/or regulations issued thereunder by the
 Board, or
 (2) Has filed to comply substantially with any
 applicable state or local housing, health or safety law.
 SECTION 1806. Eviction. No landlord shall bring any
 action to recover possession or be granted recovery of
 possession of a controlled rental unit unless:
 (a) The tenant has failed to pay the rent to which the
 landlord is entitled under the rental housing agreement
 and this Article.
 (b) The tenant has violated an obligation or covenant
 of his or her tenancy other than the obligation to
 surrender possession under proper notice and has failed
 to cure such violation after having received written
 notice thereof from the landlord in the manner required
 by law.
 (c) The tenant is committing or expressly permitting a
 nuisance in, or is causing substantial damage to, the
 controlled rental unit, or is creating a substantial
 interference with the comfort, safety or enjoyment of the
 landlord or other occupants or neighbors of the same.
 (d) The tenant is convicted of using or expressly
 permitting a controlled rental unit to be used for an
 illegal purpose.
 (e) The tenant, who had a rental housing agreement
 which has terminated, has refused, after written request
 or demand by the landlord, to execute a written extension
 or renewal thereof for a further term of like duration
 and in such terms as are not inconsistent with or
 violative of any provisions of this Article and are
 materially the same as in the previous agreement.
 (f) The tenant has refused the landlord reasonable
 access to the controlled rental unit for the purpose of
 making necessary repairs or improvements required by the
 laws of the United States, the State of California or any
 subdivision thereof, or for the purpose of showing the
 rental housing unit to any prospective purchaser or
 mortgagee.
 (g) The tenant holding at the end of the term of the
 rental housing agreement is a sub-tenant not approved by
 the landlord.
 (h) The landlord seeks to recover possession in good
 faith for use and occupancy of herself or himself, or her
 or his children, parents, brother, sister, father-in-law,
 mother-in-law, son-in-law, or daughter-in-law.
 (i) The landlord seeks to recover possession to
 demolish or otherwise remove the controlled rental unit
 from rental residential housing use after having obtained
 all proper permits from the City of Santa Monica.
 Notwithstanding the above provisions, possession shall
 not be granted if it is determined that the eviction is
 in retaliation for the tenant reporting violations of
 this Article, for exercising rights granted under this
 Article, including the right to withhold rent upon
 authorization of the Board under Section 1803(q) or
 Section 1809 of for organizing other tenants. In any
 action brought to recover possession of a controlled
 rental unit, the landlord shall allege and prove
 compliance with this Section.
 SECTION 1807. Non-Waiverability. Any provision, whether
 oral or written, in or pertaining to a rental housing
 agreement whereby any provision of this Article for the
 benefit of the tenant is waived, shall be deemed to be
 against public policy and shall be void.
 SECTION 1808. Judicial Review. A landlord or tenant
 aggrieved by any action or decision of the Board may seek
 judicial review by appealing to the appropriate court
 within the jurisdiction.
 SECTION 1809. Civil Remedies.
 (a) Any landlord who demands, accepts, receives, or
 retains any payment of rent in excess of the maximum
 lawful rent, in violation of the provisions of this
 Article or any rule, regulation or order therunder
 promulgated, shall be liable as hereinafter provided to
 the tenant from whom such payments are demanded,
 accepted, received or retained, for reasonable attorney's
 fees and costs as determined by the court, plus damages
 in an amount of five hundred ($500.00) Dollars or three
 (3) times the amount by which the
*1029 SANTA MONICA CHARTER 248-7
 ------------------------------------------------------------
 R-64
 payment or payments demanded, accepted, received or
 retained exceed the maximum lawful rent, whichever is the
 greater.
 (b) In lieu of filing a civil action as provided for in
 Section 1809(a), the Board shall establish by rule and
 regulation a hearing procedure similar to that set forth
 in Section 1805(d) for determination of the amount of the
 penalty the tenant is entitled to pursuant to Section
 1809(a). After said determination, the tenant may deduct
 the penalty from future rent payments in the manner
 provided by the Board.
 (c) If the tenant from whom such excessive payment is
 demanded, accepted, received or retained in violation of
 the foregoing provisions of this Article or any rule or
 regulation or order hereunder promulgated fails to bring
 a civil or administrative action as provided for in
 Section 1809(a) and 1810(b) within one-hundred and twenty
 (120) days from the date of occurrence of the violation,
 the Board may settle the claim arising out of the
 violation or bring such action. Thereafter, the tenant on
 whose behalf the Board acted is barred from also bringing
 an action against the landlord in regard to the same
 violation for which the Board has made a settlement or
 brought an action. In the event the Board settles said
 claim, it shall be entitled to retain the costs it
 incurred in settlement thereof, and the tenant against
 whom the violation has been committed shall be entitled
 to the remainder.
 (d) The appropriate court in the jurisdiction in which
 the controlled rental unit affected is located shall have
 jurisdiction over all actions brought under this Section.
 SECTION 1810. Criminal Remedies. Any landlord violating
 this Article shall be guilty of a misdemeanor. Any person
 convicted of a misdemeanor under the provisions of this
 Article shall be punished by a fine of not more than five
 hundred ($500.00) dollars or by imprisonment in the
 county jail for a period not exceeding six months, or by
 both such fine and imprisonment.
 SECTION 1811. Injunctive Relief. The Board, and tenants
 and landlords of controlled units, may seek relief from
 the appropriate court within the jurisdiction within
 which the affected controlled rental unit is located to
 restrain or enjoin any violation of this Article and of
 the rules, regulations, orders, and decisions of the
 Board.
 SECTION 1812. Partial Invalidity. If any provision of
 this Article or application thereof to any person or
 circumstances is held invalid, this invalidity shall not
 affect other provisions or applications of this Article
 which can be given effect without the invalid provision
 or application, and to this end the provisions of this
 Article are declared to be severable. This Article shall
 be liberally construed to achieve the purposes of this
 Article and to preserve its validity.

NOTES
[1] Plaintiffs Karen Creighton, David Dobrin, and Dale Berguson are Santa Monica taxpayers and renters who pay to their landlords $6 each month as reimbursement for a registration fee that the landlords must pay to the Board.
[2] Following entry of judgment and issuance of a peremptory writ of mandate, the trial court issued a stay order to June 30, 1984, upon the condition that defendants and real party in interest begin implementation of the judgment. The Supreme Court, however, subsequently granted a writ of supersedeas that stayed the effect of the trial court's ruling pending the outcome of this appeal.
[3] The full text of Article XVIII is set out in the appendix hereto.
[4] Santa Monica Municipal Code section 4608 provides in pertinent part as follows: "Prior to the beginning of each fiscal year, July 1, the Rent Control Board shall hold a public hearing on a proposed budget for the Rent Control Administration for said fiscal year, and shall adopt a budget. Copies of the adopted budget shall be filed with the City Clerk, Controller, and City Manager. From the effective date of the budget, the amount stated therein as proposed expenditures shall be and become appropriated by the Board to the Rent Control Administration for the respective objects and purposes therein stated...."

Santa Monica Municipal Code section 4611 provides: "Legal Staff hired by the Rent Control Board shall represent and advise the Rent Control Board and its staff in any or all actions in which the Board or its staff, in or by reason of their official capacity, are concerned or are a party."
[5] Charter, article XIII, section 1303 provides as follows: "The City Council by ordinance may assign additional functions or duties to offices, departments or agencies established by this Charter, but may not discontinue or assign to any other office, department or agency any function or duty assigned by this Charter to a particular office, department, or agency."
[6] As stated in the official ballot pamphlet mailed to all registered voters before the election: "Santa Monica is confronted with a severe housing crisis. [] The crisis was recently documented by the Rental Housing Mediation Coordinator for Santa Monica, who reported ... a portion of the tenant population is experiencing high rent increases and evictions without cause. [] The Santa Monica City Council has failed to come to grips with the problem. That is why more than 9,000 signatures were collected during an unprecedented 7-week petition campaign by supporters of renters' rights. Proposition A appears on the ballot by popular demand."
[7] Section 1803(n) provides: "The Board shall finance its reasonable and necessary expenses by charging landlords annual registration fees in amounts deemed reasonable by the Board. The first annual registration fee shall be set by the Board within thirty days after assuming office. The Board is also empowered to request and receive funding when and if necessary, from any available source for its reasonable and necessary expenses. Notwithstanding the preceding provisions of this paragraph, the City Council of the City of Santa Monica shall appropriate sufficient funds for the reasonable and necessary expenses of the Interim Board and Board during the six month period following adoption of this Article."
[8] Section 1803(p) of the Charter amendment reads as follows: "The Board shall employ and pay such staff including hearing examiners and inspectors, as may be necessary to perform its functions efficiently in order to fulfill the purposes of this Article."