Filed 9/2/14  Friends of Aviara v. City of Carlsbad CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF AVIARA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF CARLSBAD,<br><br>    Defendant and Respondent;<br><br>WEST LIVING, LLC et al.,<br><br>    Real Parties in Interest and Respondents. | D064069<br><br><br>(Super. Ct. No. 37-2012-00050757-CU-WM-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Affirmed.

DeLano & Delano, Everett L. DeLano III and M. Dare DeLano for Plaintiff and Appellant.

Celia A. Brewer, City Attorney, and Jane Mobaldi, Assistant City Attorney, for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, Dana J. Dunwoody and Karin Dougan Vogel for Real Parties in Interest and Respondents.

Friends of Aviara (Aviara) appeals a judgment denying its petition for writ of mandate challenging the City of Carlsbad's (the City) decision to approve West Senior Living R/E, LLC's application for development of the Dos Colinas project (the Project), a continuing care retirement community. Aviara contends the City failed to comply with Proposition E, which limited the number of dwelling units in the City, and the City's General Plan by designating the Project as commercial rather than residential. Aviara also argues the City violated its Habitat Management Plan (HMP) because the Project would fill floodplain and did not comply with setback requirements. We affirm the judgment denying the writ.

FACTUAL AND PROCEDURAL BACKGROUND

*Proposition E and General Plan*

In 1986, the City's voters passed Proposition E, which amended the City's General Plan and established its Growth Management Plan, which included placing limits on the number of *residential dwelling units* within each quadrant of the City. Proposition E amended the General Plan to provide the following: "To ensure that all necessary public facilities will be available concurrent with the need to serve new development it was necessary to set a limit on the number of future residential dwelling units which can be constructed in the City . . . . The maximum number of future dwelling units which may be constructed or approved in [the City's northeast] quadrant after November 4, 1986,

2

is . . . 6,166."  The Project site is located in that quadrant.  Proposition E further stated that "[t]he City shall not approve any General Plan amendment, zone change, tentative subdivision map or other discretionary approval for a development which could result in development above the limit in any quadrant."  Moreover, the cap on residential dwelling units in each quadrant "shall not be increased without an affirmative vote of the people."

The Land Use Element of the City's General Plan "establish[ed] the proper relationship between living areas and nonresidential uses" and recognized the residential dwelling unit caps mandated by Proposition E.  The Land Use Element also described various land use classifications, including residential and commercial, to "represent existing and expected land uses in the City at some future period of time."  However, the Land Use Element recognized "[w]ithin each land use designation, there exists the potential for certain unique land uses for which there are no specific designations.  Such uses may include, but are not limited to churches or hospitals.  These and other unique types of uses cannot be automatically placed within any particular land use classification and must be reviewed on an individual site basis through the conditional use permit process."

*The City's Municipal Code*

The Carlsbad Municipal Code (CMC) implemented the residential dwelling unit caps mandated by Proposition E.  (CMC, § 21.90.185.)  It also differentiated between commercial and residential dwelling units.  (CMC, §§ 21.04.093, 21.04.115, 21.04.120.)  A "'[c]ommercial living unit' means a unit that may be within but is not limited to a *professional care facility*, hotel, motel, time-share or bed and breakfast that provides the

3

basic amenities for everyday living and may include but is not limited to a sleeping area or bedroom(s), closet space, restroom, sitting/entertainment area and kitchen facilities. Commercial living units are distinguished from dwelling units due to the assistance/services provided in conjunction with the living unit and/or the use of the living unit for temporary lodging."  (CMC, § 21.04.093.)  In contrast, a " '[d]welling' means a building or portion thereof designed exclusively for residential purposes, including one-family, two-family and multiple-family dwellings, but does not include commercial living units" (CMC, § 21.04.115) and a " '[d]welling unit' means one or more rooms in a dwelling or apartment house and designed for occupancy by one family for living or sleeping purposes, and having only one kitchen" (CMC, § 21.04.120).

The CMC also defined a "professional care facility" as a "facility in which food, shelter, and some form of professional service is provided such as nursing, medical, dietary, exercising or other medically recommended programs.  Not included in this definition are hospitals and mental hospitals."  (CMC, § 21.04.295.)  Professional care facilities were permitted in the City with the approval of a conditional use permit in a "residential density-multiple" (RD-M) zone, which included residential medium density, residential medium-high density and residential high density land use designations as specified in the General Plan.

*The Project*

West Senior Living R/E, LLC applied to the City to develop the Project, a 305-unit continuing care retirement community for elderly residents, and to relocate recreational vehicle storage and a garden area on the subject property.  The Project site

4

consisted of 46 acres of undeveloped land within the City's northeast quadrant, which had historically been used for agricultural purposes. The Project site was not located within the coastal zone and was "characterized by two large hills . . . and low-lying terrain located in the floodplain along the southern and northwestern boundaries."

The Project proposed dividing the 46-acre site into three parcels. Parcel 1, the largest of the three parcels, consisted of the continuing care retirement community. That community included "58 detached single-story cottages, 166 apartment-style independent living (IL) units, and a[n] 81-room/95-bed assisted living/Alzheimer facility." According to a staff report to the City's Planning Commission, "[p]ursuant to [the CMC], the units are classified as a professional care facility (CMC Section 21.04.295) as well as commercial living units (CMC Section 21.04.093). In general, a [continuing care retirement community] offers a continuum of care which includes housing and a wide range of medical, social and recreational services for seniors. . . . [T]he [continuing care retirement community] does not include a transfer of any real property or interest to the residents. Because there is no transfer of title in the form of real estate, there are no residential lots; instead, the residents enter into a contractual agreement which guarantees a certain level of service and health care for an extended period of time."

Each Project resident would be classified into five levels and charged monthly dues according to their level of care. The five levels included "active," "slightly frail," "frail," "medically frail," and "memory impaired." The lowest level or "active" members received services for things such as wellness and medication monitoring. On the other end of the spectrum, "memory impaired" members received nursing and close

5

supervision. Additionally, the community would be licensed by the California State Department of Social Services as a "Continuing Care Retirement Community."

The Project proposed developing Parcel 2 as a 2.1-acre recreational vehicle storage area and a 2.8-acre garden area. Parcel 3 would be 1.21 acres of open space "to preserve existing native upland habitat and to provide an area for on-site habitat-based mitigation for the . . . [P]roject."

The City's Planning Commission considered the Project and Environmental Impact Report (EIR). The Planning Commission found that changing the General Plan land use designations to residential medium for Parcels 1 and 2 (continuing care retirement community and recreational vehicle/garden area) and open space for Parcel 3 was consistent with those land use designations. Further, the Planning Commission determined that an associated zone change to RD-M, residential mobile home park and open space was consistent with the General Plan to implement the new land use designations. The Planning Commission stated, "the Zone Change is consistent with the public convenience, necessity, and general welfare, and is consistent with sound planning principles in that the residential and open space uses allowed by the proposed zone change are compatible with the adjacent and future residential and open space uses."

The Planning Commission concluded "[t]hat the requested use is necessary or desirable for the development of the community, and is in harmony with the various elements and objectives of the general plan . . . in that the proposed professional care facility provides an alternative to the long-term residential, social, and health care needs of elderly residents. The facility, which includes a combination of detached cottages,

6

independent apartment-style independent living units as well as assisted living, offers a continuum of care to minimize trauma associated with a transfer and allows for the provision of social and health care services in a licensed setting. . . . [T]he professional care facility is consistent with the Residential Medium Density (RM) General Plan Land Use designation in that it will provide the elderly with a sense of community. In addition, the [P]roject is consistent with the various elements and objectives of the General Plan in that the [P]roject permanently preserves sensitive upland habitat and includes the development of the core and frontage improvements for the extension of . . . a prime arterial road . . . . [T]he General Plan recognizes the need and benefit for a variety of housing, including uses such as the proposed professional care facility for seniors as well as affordable housing."

The Planning Commission voted to approve certain aspects of the Project and recommended the City Council approve other aspects of the Project and Environmental Impact Report (EIR). The approvals considered included a General Plan amendment, zone change, residential mobile home park permit amendment, hillside development permit, EIR, local facilities management plan amendment, HMP permit, site development plan, special use permit and conditional use permit. The City Council incorporated the Planning Commission's findings and approved the Project and EIR.

Aviara filed a petition for writ of mandate in the trial court challenging the City's decision. The trial court denied the petition in its entirety. In considering Aviara's arguments concerning the residential dwelling unit caps mandated by Proposition E, the trial court concluded that the Project consisted of "commercial living units, as

7

distinguished from dwellings/dwelling units [citation], based upon the assistance/services provided in conjunction with the living unit. . . . Since the [P]roject does not include residential dwelling units it is not subject to the residential dwelling unit caps established by Proposition E and the [P]roject approval was therefore not inconsistent with Proposition E." Further, Aviara failed to show that the RD-M zone excluded uses other than residential or that the residential medium General Plan designation precluded "unique non-residential uses through the conditional use permit process."

DISCUSSION

I. *Proposition E and General Plan*

Aviara argues the City violated its Growth Management Plan because the City did not comply with (1) Proposition E's cap on the construction or approval of dwelling units, and (2) its General Plan by designating the Project as commercial rather than residential. Because Proposition E by its terms amended the City's General Plan, both of Aviara's arguments are essentially claims that the Project is inconsistent with the General Plan.

A city's land use decisions must be consistent with its general plan. (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563 (*Pfeiffer*).) "'"'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' [Citation.]" [Citation.] State law does not require perfect conformity between a proposed project and the applicable general plan . . . . [Citations.]' [Citation.] In other words, 'it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . . It is enough

8

that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan.  [Citations.]'" (*Ibid.*)

"We review the agency's decision regarding consistency with the general plan 'directly and are not bound by the trial court's conclusions.  [Citations.]'  [Citation.]  'A city's findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion.  [Citation.]'  [Citation.]  Thus, the party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable.  [Citation.]" (*Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1563.)

Here, Aviara concedes that the Project's approval did not result in dwelling units in excess of the cap mandated by Proposition E and the City's General Plan.  Instead, Aviara contends that by characterizing the Project as commercial, the City "violated Proposition E and its own General Plan, essentially and illegally amending the voter-mandated caps." Specifically, Aviara claims "[t]he failure to treat the . . . Project as a project for which the cap is relevant results in a *de facto* amendment to the cap — the Project's 305 units have the effect of pushing the total number of dwelling units located in the City's northeast quadrant to 6,471 units [without the required voter approval]."  Thus, Aviara's objections in essence pertain to the City's classification of the Project as commercial rather than residential and we center our analysis on that point.

The General Plan limited the number of "residential dwelling units" in each quadrant of the City.  Although the General Plan did not define that term, the CMC

9

differentiated between commercial and residential dwelling units.  (CMC, §§ 21.04.093, 21.04.115, 21.04.120.)  Of importance here, the CMC's definition of "commercial living units" included professional care facilities.  (CMC, § 21.04.093.)  As "commercial living units," professional care facilities fall outside the CMC's definition of a "dwelling." (CMC, § 21.04.115.)  Pursuant to the General Plan, professional care facilities are permitted in RD-M zones with the approval of a conditional use permit.

Aviara urges us to ignore the CMC because the distinction between "commercial living units" and "dwelling units" is not found in Proposition E.  However, where the voters have passed an initiative, the City may enact ordinances that clarify and implement the intent of the electorate.  (*Creighton v. City of Santa Monica* (1984) 160 Cal.App.3d 1011, 1021.)  This is precisely what the CMC does in this case.  Contrary to Aviara's suggestion, the City did not rewrite Proposition E through the CMC.  Further, Aviara has not shown that the CMC is contrary to the intent of the electorate.  In our view, the CMC is consistent with Proposition E's purpose to limit the number of *residential* dwelling units in the City and the provisions differentiating between commercial and residential dwelling units do not run afoul of this purpose.

Although Aviara does not contest designation of the Project as a professional care facility, it contends the Project should have been classified as residential rather than commercial because the Project's residents will "dwell" there for more than a temporary period.  Whether a resident will "reside" or "dwell" in a unit is not the only consideration. Rather, the CMC distinguishes "commercial living units" from "dwelling units" "due to

the assistance/services provided in conjunction with the living unit and/or the use of the living unit for temporary lodging." (CMC, § 21.04.093.)

The record establishes the Project's facilities would provide residents with a range of assistance including, medical, dietary, recreational and support services. Those residents would enter into contractual agreements in which they received a continuum of care depending on the level of their needs. The Project's medical and resident care directors would periodically review each resident to assess and respond to changes in the resident's functioning. Even the lowest level of care for "active" members included wellness services and medication monitoring. Based on the continuum of assistance and services provided, the City properly classified the Project as commercial as it fit the CMC's definition of a "professional care facility" by providing "nursing, medical, dietary, exercising or other medically recommended programs." (CMC, § 21.04.295.) As a professional care facility, the Project's classification as "commercial living units" was not inconsistent with Proposition E and the General Plan's limit on residential dwelling units.

The City changed the General Plan land use designation for the parcel containing the continuing care retirement community to residential medium density and, to implement that new designation, it changed the zone to RD-M. Aviara contends these amendments were inconsistent with the City's classification of the Project as commercial rather than residential. We disagree.

The City did not apply a "commercial" land use designation to the Project as set forth in the Land Use Element of the General Plan. Instead, it changed the land use designation to residential medium density and the zone to RD-M. There is nothing in the

11

General Plan prohibiting "commercial living units" in a residential designation. Rather, the General Plan recognized that "[w]ithin each land use designation, there exists the potential for certain unique land uses for which there are no specific designations. Such uses may include, but are not limited to churches or hospitals. These and other unique types of uses cannot be automatically placed within any particular land use classification and must be reviewed on an individual site basis through the conditional use permit process." Professional care facilities are one of these unique uses permitted with the approval of a conditional use permit in a RD-M zone, which includes the residential medium land use designation.

To support its argument that the City classified the Project as commercial merely to avoid voter mandated caps on residential dwelling units, Aviara cites to the City's use of the terms "dwelling units" and "residential" when the City discussed the Project. We are not convinced by Aviara's argument as it cites to a reference to "dwelling units" in the traffic impact portion of the City's environmental impact analysis and to the City's use of the term "residential" in the Planning Commission's findings regarding the zone change to RD-M. These references do not convince us that the City improperly approved the Project within a residential medium density land use designation and RD-M zone.

Aviara failed to meet its burden to show the City's determination that the Project was consistent with the General Plan was unreasonable. (*Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1563.)

12

## II. *HMP*

### A. Additional Background

The City's HMP "is a long-range plan for conserving wildlife habitat while still allowing for additional development to occur in the City. The plan establishes a wildlife preserve system consisting of approximately 5,750 acres of existing and proposed open space." Section 21.210.030 of the CMC requires "[a]ll development projects . . . in the [C]ity [to] comply with the habitat preservation and conservation standards contained in the [C]ity's [HMP]."

The Project site is located in Zone 15 of the HMP. The planning standards for that zone include "conserv[ing] all riparian habitats onsite, and prohibit[ing] fill or development within the existing flood plain except where required for Circulation Element roads, Drainage Master Plan facilities, or other essential infrastructure. . . . When conversion of agricultural lands to other uses is proposed, set back all development impacts at least 100 feet from existing wetland habitats and require habitat restoration or enhancement in the riparian buffer areas."

The HMP provided that "[w]hen impacts and measures have been identified, the project proponent will submit the documentation to City's Planning Department for review. . . . If the Planning Director determines that the measures are consistent with the HMP and the conservation standards, the City will consult with the wildlife agencies and begin CEQA review. If the measures are determined to be inconsistent with the HMP and the standards, a revised proposal will be required. If wildlife agencies concur that the measures are consistent, the project shall be considered consistent with the HMP."

13

The Project in this case would result in filling 5.09 acres of upland floodplain, including 1.05 acres that was not for essential infrastructure. According to the EIR, although the "Project [was] not independently consistent with the HMP relative to prohibitions on floodplain filling," there was no net loss of floodplain because of offsetting measures. As a result of the offsetting measures, the Project "would result in an overall superior floodplain function and value than that being lost."

The Project also did not strictly comply with the 100-foot buffer requirement in three areas. The first and second areas were for sewer facilities and a storm drain, respectively. The EIR explained that deviations for these items were allowed under the City's Guidelines for Wetland and Riparian Buffers. The remaining area was for realignment of an access road that would not significantly change the existing conditions of the site.

The U.S. Fish and Wildlife Service and California Department of Fish and Game (the Wildlife Agencies) reviewed the Project. In regard to the three deviations from the 100-foot buffer requirement, the Wildlife Agencies determined that "[i]n each of these situations, existing conditions preclude[d] the provision of a 100-foot buffer." The Wildlife Agencies also considered floodplain fill associated with the Project and determined that "1.05-acre[s] of Agua Hacienda Creek floodplain fill proposed for the [continuing care retirement community] (non-essential infrastructure) is, strictly speaking, non-compliant with the HMP's prohibition of fill or development within the existing floodplain in Zone[ 15] . . . except where required for essential infrastructure." They nevertheless concurred that the Project was consistent with the City's HMP. The

14

Wildlife Agencies also noted that "the floodplain areas to be filled for non-essential infrastructure (i.e., [continuing care retirement community]) contain low corridor values, and (whether filled or restored) provide limited benefit to wildlife movement."

The trial court found Aviara failed to show the Project did not meet HMP guidelines for riparian buffers because the HMP "acknowledges that 100 foot buffers are not always feasible and allows for reductions in buffer widths if sufficient information is provided to determine that a buffer of lesser width will protect identified resources. The record reflects that an exception is allowed for sewer facilities and that here it was necessary to place a road serving only sewer maintenance within the 100 foot buffer, and that a buffer of lesser width would protect the identified resources."

Similarly, the trial court concluded Aviara failed to meet its burden to establish the Project violated the HMP's prohibition of development of non-essential infrastructure in the floodplain, reasoning the following: "The EIR explains that the overall floodplain modifications proposed result in no net loss of floodplain and the proposed [P]roject would result in an overall superior floodplain function in value than that being lost as documented by the Wildlife Agencies."

B.  The City's Request for Judicial Notice of the HMP Implementing Agreement

In its respondent's brief, the City requests that we take judicial notice of an Implementing Agreement between the City and the Wildlife Agencies.  The trial court declined to take judicial notice of the Implementing Agreement because it was not part of the administrative record.  The City concedes that the Implementing Agreement was not part of the record, but argues we should take judicial notice of it because the HMP, which

15

was a part of the administrative record, states the Implementing Agreement was part of that document.

To obtain judicial notice by a reviewing court, the requesting party must file a separate motion stating (1) why the matter to be noticed is relevant to the appeal, (2) whether the matter was presented to the trial court and, if so, whether the trial court took judicial notice of the matter, (3) if judicial notice was not taken by the trial court, why the matter is subject to judicial notice under Evidence Code sections 451, 452, or 453, and (4) whether the matter relates to proceedings occurring after the judgment or order subject to appeal. (Cal. Rules of Court, rule 8.252(a).)

The City made its request as part of its respondent's brief in this appeal. We decline to consider the request because the City has not complied with the California Rules of Court, rule 8.252, governing requests for judicial notice in this court. (*Canal Ins. Co. v. Tackett* (2004) 117 Cal.App.4th 239, 243.) Even if the City had complied with the California Rules of Court, we would deny its request for judicial notice because we may not consider evidence outside the administrative record. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 565 [quasi-legislative actions]; *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1594-1596 [quasi-judicial actions].)

C. Floodplain Fill

Aviara argues substantial evidence did not support the EIR's findings pertaining to floodplain fill. Specifically, Aviara contends the HMP prohibited 1.05 acres of the

16

Project's 5.09 acres of floodplain fill because it was not for essential infrastructure and the HMP did not allow for offsetting measures. We reject these arguments.

In reviewing an agency's actions under California Environmental Quality Act, we consider only whether the agency prejudicially abused its discretion, either by failing to proceed in a manner required by law or by making a decision unsupported by substantial evidence. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392.)

Here, the EIR adequately mitigated and analyzed the Project's impact on the floodplain. The EIR noted that as a result of the offsetting measures, the Project "would result in an overall superior floodplain function and value than that being lost." Moreover, there was no net loss of floodplain. Aviara contends any offset was irrelevant because the HMP required strict compliance with its prohibition on floodplain fill. Although the HMP prohibits fill in existing floodplain except in circumstances not relevant to the challenged 1.05 acres in this case, it also provides that "[i]f [W]ildlife [A]gencies concur that [conservation] measures are consistent [with the HMP and conservation standards], the [P]roject shall be considered consistent with the HMP."

The Wildlife Agencies reviewed the Project and recognized that the 1.05 acres of floodplain fill to accommodate the Project's continuing care retirement community was not strictly compliant with the HMP's prohibition on floodplain fill. Yet, the Wildlife Agencies concurred that the Project was consistent with the City's HMP, finding the floodplain area to be filled had low corridor values and provided limited benefit to

17

wildlife movement. Accordingly, we conclude the City did not violate the HMP by approving the Project's EIR which allowed floodplain fill with offsetting measures.

D. 100-Foot Buffer Requirement

Aviara argues the Project violates the HMP's requirement to set back all development impacts at least 100 feet from existing wetland habitats. We reject this argument.

"From time to time, the city planner may, upon review by the city attorney, prepare guidelines to assist in the implementation of [Habitat Preservation and Management Requirements] or the HMP, including but not limited to, wetland preservation and mitigation. The city planner shall have the authority to approve and publish any guidelines." (CMC, § 21.210.90.) The City's Guidelines for Wetland and Riparian Buffers permitted alternative buffer configurations where the buffers were reduced minimally below the 100-foot buffer requirement but preserved the resource for which buffers are required.

Here, the Project did not comply with the 100-foot buffer requirement in three areas. Two of those areas were for sewer facilities and a storm drain. As the EIR explained, the City's Guidelines for Wetland and Riparian Buffers permitted deviances from the buffer requirements for these uses. The remaining buffer deviance was for realignment of an access road that would not significantly change the existing conditions of the site. The Wildlife Agencies considered the three exceptions to the HMP's buffer requirements but nevertheless concurred that the Project was consistent with the HMP.

18

Aviara does not cite to any authority prohibiting the City from adopting guidelines to assist in the implementation of the HMP or explain how those guidelines are contrary to the HMP's purpose. Instead, Aviara merely argues the "'guidelines' are not part of the HMP and it is the HMP with which the Project must comply." This is not a sufficient argument to persuade us. Aviara also fails to explain how each of the three areas of deviation are inconsistent the with City's Guidelines for Wetland and Riparian Buffers. Accordingly, we reject Aviara's argument pertaining to the HMP's buffer requirements.

DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.


MCINTYRE, J.

WE CONCUR:

HALLER, Acting P. J.

MCDONALD, J.


19